United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 9, 1999 Decided March 3, 2000 

 No. 98-1497

 State of Michigan, 
 Michigan Department of Environmental Quality and 
 State of West Virginia, Division of 
 Environmental Protection, 
 Petitioners

 v.

 U.S. Environmental Protection Agency, 
 Respondent

 New England Council, Inc., et al., 
 Intervenors

 ---------

 

 

 Consolidated with 
 98-1499, 98-1500, 98-1501, 98-1502, 98-1504, 98-1518, 
 98-1556, 98-1567, 98-1573, 98-1585, 98-1588, 98-1590, 
 98-1596, 98-1598, 98-1601, 98-1602, 98-1608, 98-1609, 
 98-1611, 98-1615, 98-1616, 98-1617, 98-1618, 98-1619, 
 98-1621, 99-1070, 99-1093

 On Petitions for Review of an Order of the 
 Environmental Protection Agency

 Susan E. Ashbrook, Assistant Attorney General, State of 
Ohio, James C. Gulick, Special Deputy Attorney, State of 
North Carolina, Andrea B. Field, Theodore L. Garrett, Todd 
Palmer, Jonathan S. Martel, William F. Pedersen and Scott 
H. Segal argued the causes for petitioners. With them on the 
briefs were Betty D. Montgomery, Attorney General, State of 
Ohio, Andrew S. Bergman, Assistant Attorney General, Mi-
chael F. Easley, Attorney General, State of North Carolina, 
J. Allen Jernigan, Special Deputy Attorney General, James 
P. Longest, Jr., and Amy R. Gillespie, Assistant Attorneys 
General, Bill Pryor, Attorney General, State of Alabama, 
Tommy E. Bryan, Assitant Attorney General, Jeffrey Modi-
sett, Attorney General, State of Indiana, Daniel B. Dovenbar-
ger, Chief Counsel, Jennifer M. Granholm, Attorney General, 
State of Michigan, Thomas Casey, Solicitor General, Alan F. 
Hoffman, Assistant Attorney General, Charles M. Condon, 
Attorney General, State of South Carolina, Mark E. Earley, 
Attorney General, State of Virginia, Roger L. Chaffe, Senior 
Assistant Attorney General, Stewart T. Leeth, Assistant At-
torney General, Thomas H. Zerbe, Senior Counsel, State of 
West Virginia, Samuel L. Finklea, III, Grant Crandall, 
Eugene M. Trisko, Norman W. Fichthorn, Mel S. Schulze, 
David M. Flannery, Kathy Beckett, Harold P. Quinn, Jr., 
Michael D. Hockley, J. Lister Hubbard, R. Brooke Lawson, 
III, Robert E. Lannan, II, Terry J. Satterlee, Alok Ahuja, 

Mark E. Shere, Bryan G. Tabler, Jeffrey L. Landsman, 
Jennifer S. McGinnity, Howard E. Shapiro, Margaret Clai-
borne Campbell, Thomas E. Knauer, David R. Straus, Debo-
rah E. Jennings, Julie R. Domike, Patricia T. Barmeyer, 
Lisa G. Dowden, Brian J. Renaud, Rhonda L. Ross, Jeffrey 
F. Cherry, Katherine L. Rhyne, John M. Koeppl, Henry J. 
Handzel, Jeffrey A. Knight, Joan Dreskin, Kevin B. Belford, 
Pamela A. Lacey, Gene E. Godley, Michael H. Levin and 
Edmund B. Frost. Earle D. Getchell, Jr., Neal J. Cabral, 
Christopher D. Man, Jacqueline H. Fine, Jon S. Faletto and 
John P. Proctor entered appearances.

 James E. Doyle, Attorney General, State of Wisconsin, and 
Philip Peterson and Thomas L. Dosch, Assistant Attorneys 
General, were on the brief for intervenor State of Wisconsin.

 Louis E. Tosi and William L. Patberg were on the brief for 
amicus curiae Toledo Metropolitan Area Council of Govern-
ments.

 Charles S. Carter and Deborah Ann Hottel were on the 
brief of amici curiae South Carolina Chamber of Commerce, 
Environmental Management Association of South Carolina, 
South Carolina Manufacturers Alliance, and South Carolina 
Farm Bureau Federation.

 Jon M. Lipshultz and Patricia R. McCubbin, Attorneys, 
U.S. Department of Justice, argued the causes for respon-
dent. With them on the brief were Lois J. Schiffer, Assistant 
Attorney General, and Jan Tierney, Howard Hoffman, Amey 
W. Marrella and Dwight C. Alpern, Attorneys, U.S. Environ-
mental Protection Agency.

 J. Jared Snyder, Assistant Attorney General, State of New 
York, argued the cause for state intervenors. With him on the 
brief were Elliot Spitzer, Attorney General, Peter H. Schiff, 
Deputy Attorney General, Thomas F. Reilly, Attorney Gener-
al, State of Massachusetts, William L. Pardee, Assistant 
Attorney General, M. Dukes Pepper, Jr., Assistant Counsel, 
State of Pennsylvania, Sheldon Whitehouse, Attorney Gener-
al, State of Rhode Island, Michael Rubin, Environmental 
Advocate, William H. Sorrell, Attorney General, State of 

Vermont, Ronald A. Shems, Assistant Attorney General, 
Jennifer L. Wurzbacher, Assistant Attorney General, State of 
Maryland, Richard Blumenthal, Attorney General, State of 
Connecticut, Richard F. Webb, Assistant Attorney General, 
Andrew Ketterer, Attorney General, State of Maine, Paul 
Stern, Deputy Attorney General, Philip McLaughlin, Attor-
ney General, State of New Hampshire, and Maureen D. 
Smith, Assistant Attorney General.

 Kathleen L. Millian argued the cause for intervenor Her 
Majesty the Queen in Right of Ontario (Province of Ontario, 
Canada). With her on the brief was Bruce J. Terris.

 David Hawkins and Raissa Griffin were on the brief for 
intervenor Natural Resources Defense Council, et al. An-
drew P. Caputo entered an appearance.

 Patrick M. Raher, John G. Roberts, Jr., Catherine E. 
Stetson, Michael R. Barr, Michael A. Conley, Theresa Fene-
lon Falk, John H. Sharp, Paul G. Wallach and Kenneth R. 
Meade were on the brief for industry intervenors.

 Richard A. Wegman was on the brief for intervenor the 
Government of Canada.

 Before: Williams, Sentelle and Rogers, Circuit Judges.

 Opinion Per Curiam.*

 Dissenting opinion filed by Circuit Judge Sentelle.

 Introduction
 Under the Clean Air Act the Environmental Protection 
Agency promulgates national ambient air quality standards 
("NAAQS") for air pollutants, and states must then adopt 
state implementation plans ("SIPs") providing for the imple-
mentation, maintenance, and enforcement of the NAAQS; 
such plans are then submitted to EPA for approval. See 
Clean Air Act ("CAA") s 110(a)(1), 42 U.S.C. s 7410(a)(1) 
(1994). Even after a SIP is approved, EPA may at a later 
time call for SIP revisions if the Administrator finds a SIP 
__________
 * Judge Williams wrote Parts I.B-C and II.B; Judge Sentelle 
wrote Parts I.A, II.A, II.C, and III.A; Judge Rogers wrote Parts 
III.B and IV.

inadequate to attain or maintain the NAAQS, to meet the 
dictates of pollutant transport commissions, or "to otherwise 
comply with any requirement of this chapter." CAA 
s 110(k)(5), 42 U.S.C. s 7410(k)(5).

 In October 1998 EPA issued a final rule mandating that 22 
states and the District of Columbia revise their SIPs to 
mitigate the interstate transport of ozone.1 See Finding of 
Significant Contribution and Rulemaking for Certain States 
in the Ozone Transport Assessment Group Region for Pur-
poses of Reducing Regional Transport of Ozone ("Final 
Rule"), 63 Fed. Reg. 57,356 (1998). The statutory hook for 
EPA's action was a 1990 amendment to the Clean Air Act 
which requires that SIPs contain "adequate provisions" pro-
hibiting

 any source or other type of emissions activity within the 
 State from emitting any air pollutant in amounts which 
 will ... contribute significantly to nonattainment in, or 
 interfere with maintenance by, any other State with 
 respect to any such national primary or secondary am-
 bient air quality standard.
 
CAA s 110(a)(2)(D)(i)(I), 42 U.S.C. s 7410(a)(2)(D)(i)(I) 
(1994). EPA uniformly required that each state reduce nitro-
gen oxides (NOx--an ozone precursor) by the amount accom-
plishable by what EPA dubbed "highly cost-effective con-
trols," namely, those controls EPA found capable of removing 
NOX at a cost of $2000 or less per ton. Numerous petitions 
for review challenge various aspects of EPA's decision.

 In Part I we reject the following claims: that EPA could 
not call for the SIP revisions without convening a transport 
commission; that EPA failed to undertake a sufficiently 
state-specific determination of ozone contribution; that EPA 
unlawfully overrode past precedent regarding "significant" 
contribution; that EPA's consideration of the cost of NOx 

__________
 1 The states are Alabama, Connecticut, Delaware, Georgia, Illi-
nois, Indiana, Kentucky, Maryland, Massachusetts, Michigan, Mis-
souri, North Carolina, New Jersey, New York, Ohio, Pennsylvania, 
Rhode Island, South Carolina, Tennessee, Virginia, West Virginia, 
and Wisconsin.

reduction violated the statute; that EPA's scheme of uniform 
controls is arbitrary and capricious; that CAA 
s 110(a)(2)(D)(i)(I) as construed by EPA violates the nondele-
gation doctrine.

 In Part II we hold that the record does not support 
including Wisconsin in the SIP call, nor does it support 
creating NOx budgets based on the entire emissions of Mis-
souri or Georgia. We reject the claim that South Carolina 
was improperly included in the SIP call.

 In Part III we reject the claim that EPA impermissibly 
intruded on the statutory rights of states to fashion their 
SIPs. We also reject the claim that EPA violated the Regu-
latory Flexibility Act.

 In Part IV we reject the claim that EPA arbitrarily revised 
the definition of a "NOx budget unit." We reject all of the 
claims raised by the Council of Industrial Boilers save one: 
we hold that EPA failed to provide adequate notice of a 
change in the definition of an electric generating unit. We 
also hold that EPA did not provide adequate notice of a 
change in the control level assumed for large, stationary 
internal combustion engines, but we reject the claim that 
EPA failed to follow its own standards in defining such 
engines. Finally, we uphold EPA's limits on early reduction 
credits, and EPA's use of a 15% multiplier for calculating 
emissions from low mass emission units.

 We note at the outset that one challenge has been stayed. 
In 1979, EPA set the acceptable level for ozone in the 
ambient air at 0.12 parts per million ("ppm"), averaged over 
intervals of one hour. This standard is commonly known as 
the "1-hour standard." By 1997, EPA had concluded that the 
1-hour standard no longer adequately protected public 
health. See National Ambient Air Quality Standards for 
Ozone, 62 Fed. Reg. 38,856 (1997). Pursuant to the agency's 
statutory mandate to review and revise NAAQS as appropri-
ate, 42 U.S.C. s 7409(d)(1), EPA promulgated a new, more 
stringent "8-hour standard" which limits ozone levels to 0.08 
ppm, averaged over an 8-hour period. See 62 Fed. Reg. 
38,856 (codified at 40 C.F.R. s 50.10).

 EPA has undertaken the phasing out of the 1-hour stan-
dard on an area-by-area basis, mandating that the standard 
would no longer apply to an area once it is "determine[d] that 
the area has air quality meeting the 1-hour standard." 40 
C.F.R. s 50.9(b). The call for SIP revisions in question here 
requires the covered upwind states to submit SIP revisions 
pursuant to the 8-hour standard even though EPA was not 
designating any 8-hour nonattainment areas prior to July 
1999. See 63 Fed. Reg. at 57,370; Transportation Equity Act 
for the 21st Century, Pub. L. No. 105-178, s 6103, 112 Stat. 
107, 465 (1998) (providing that states submit suggested desig-
nations no later than July 1999 and EPA finalize those 
designations no later than July 2000). EPA maintains that it 
has the authority to include the 8-hour standard in the 
current s 110(a)(2)(D)-specific SIP call pursuant to its au-
thority under s 110(a)(1). Section 110(a)(1) provides that

 [e]ach State shall ... adopt and submit to [EPA], within 
 3 years (or such shorter period as [EPA] may prescribe) 
 after the promulgation of a national primary ambient air 
 quality standard (or any revision thereof) ..., a plan 
 which provides for implementation, maintenance, and 
 enforcement of such primary standard in each air quality 
 control region (or portion thereof) within such State.
 
42 U.S.C. s 7410(a)(1).

 State and Industry/Labor petitioners initially attacked the 
challenged SIP call on the basis that EPA exceeded its 
statutory authority and acted arbitrarily in basing the SIP 
call on the 8-hour standard when the agency had not yet 
designated any areas as being in nonattainment under the 
new standard. After petitioners' final briefs were submitted, 
we held in American Trucking Ass'ns, Inc. v. EPA, 175 F.3d 
1027, reh'g granted in part, den'd in part 195 F.3d 4 (D.C. 
Cir. 1999), that the new NAAQS based on the 8-hour stan-
dard was derived from a construction of the Clean Air Act 
that rendered the relevant provision an unconstitutional dele-
gation of legislative power and remanded the case to the 
agency. See id. at 1033-40. Seizing on this holding, petition-
ers added in their reply briefs that if this court does not 

accept the contention in their original briefs as to why EPA 
impermissibly relied on the 8-hour standard, then we should 
hold that American Trucking means that EPA cannot rely on 
the 8-hour standard because it was promulgated in violation 
of the non-delegation doctrine.

 Regardless, EPA moved to stay consideration of the issues 
involving the 8-hour standard because the agency has stayed 
the 8-hour findings contained in the challenged SIP call. We 
granted the motion. Because EPA's stay removes the 8-hour 
findings as a basis for the SIP call, we will resolve only the 
issues involving the 1-hour standard.

 I. General Claims

A. Transport Commission

 States have the primary responsibility to attain and main-
tain NAAQS within their borders. See CAA s 107(a), 42 
U.S.C. s 7407(a). When EPA concludes that an "implemen-
tation plan for any area is substantially inadequate to attain 
or maintain the relevant [NAAQS], to mitigate adequately the 
interstate pollutant transport described in section [176A] or 
[184], or to otherwise comply with any requirement of this 
chapter," the CAA requires EPA to order a state to revise 
and correct its SIP "as necessary" ("SIP call"). CAA 
s 110(k)(5), 42 U.S.C. s 7410(k)(5). One such "requirement 
of this chapter," is the "good neighbor provision" of section 
110(a)(2)(D). As amended, section 110(a)(2)(D) requires that 
a SIP "contain adequate provisions"

 (i) prohibiting, consistent with the provisions of this sub-
 chapter, any source or other type of emissions activity 
 within the State from emitting any air pollutant in 
 amounts which will ... contribute significantly to nonat-
 tainment in, or interfere with maintenance by, any other 
 State with respect to any such national primary or 
 secondary ambient air quality standard ... [and]
 
 (ii) insuring compliance with the applicable requirements 
 of sections [126] and [115] ... (relating to interstate and 
 international pollution abatement).
 
42 U.S.C. s 7410(a)(2)(D) (emphasis added). Section 126(b) 
enables an individual state or a political subdivision of a state 
to petition EPA to make a "finding that any major source or 
group of stationary sources emits or would emit any air 
pollutant in violation of the prohibition of [s 110(a)(2)(D)(ii)]." 
42 U.S.C. s 7426(b). EPA may make or deny such a finding. 
See id. Section 115 pertains to petitions made by foreign 
countries. See 42 U.S.C. s 7415.

 Title I, the subchapter referenced in section 110(a)(2)(D), 
also includes sections 176A and 184, the provisions referenced 
in section 110(k)(5). In 1990, Congress added a provision to 
section 176A stating that EPA "may" establish an interstate 
air pollution transport region whenever EPA "has reason to 
believe that the interstate transport of air pollutants from one 
or more States contributes significantly to a violation of a 
national ambient air quality standard in one or more other 
States." 42 U.S.C. s 7506a(a). The section also provides 
that whenever EPA "establishes a transport region ... 
[EPA] shall establish a transport commission." 42 U.S.C. 
s 7506a(b)(1). Among other things, a section 176A commis-
sion is to assess the interstate transport situation in the 
relevant transport region, assess interstate pollution mitiga-
tion strategies, and recommend to EPA measures necessary 
"to ensure that the plans for the relevant States meet the 
requirements of [section 110(a)(2)(D)]." 42 U.S.C. 
s 7506a(b)(2). In addition, section 176A permits a transport 
commission to request that EPA "issue a finding under 
[section 110(k)(5)] ... that the implementation plan for one or 
more of the States in the transport region is substantially 
inadequate to meet [section 110(a)(2)(D) requirements]." 42 
U.S.C. s 7506a(c). After public comment, EPA has the au-
thority to approve, approve in part, or disapprove such a 
request. See id.

 In part, section 184, an ozone-specific provision, establishes 
an ozone transport region in the northeast ("NOTR") and sets 
the deadline for convening the transport commission required 
as a result of NOTR's establishment. See 42 U.S.C. 
s 7511c(a). The section also requires that "[i]n accordance 
with [section 110] ... each State included [or subsequently 

included] within a transport region established for ozone shall 
submit a State implementation plan or revision" regarding 
vehicle inspection programs and volatile organic compounds 
control technology. 42 U.S.C. s 7511c(b). In addition, section 
184 contains provisions giving states within an established 
transport region the opportunity to use their section 
176A-established transport commission to help develop addi-
tional ozone control measures. See 42 U.S.C. s 7511c(c).

 Efforts to control states' upwind contributions to ozone 
pollution continued to fall short during the early 1990s. In 
1995, upon the recommendation of the Environmental Council 
of the States, thirty-seven states and representatives from 
EPA, industry, and environmental groups formed a national 
work-group called the Ozone Transport Assessment Group 
("OTAG") to study and devise solutions to the interstate 
ozone transport problem. See 62 Fed. Reg. 60,318, at 60,319; 
EPA, Ozone Transport Assessment Group Executive Report, 
EPA Document No. A 95-56, Doc. No. II-G-05 ("Executive 
Report") at ii. More specifically, OTAG's purpose was to 
"identify and recommend a strategy to reduce transported 
ozone and its precursors, which, in combination with other 
measures, will enable attainment and maintenance of the 
ozone standard in the OTAG region." Executive Report at ii. 
OTAG concluded that upwind states needed to reduce NOx 
emissions in order to address the transport problem. Howev-
er, the OTAG members could not agree on specific control 
measure recommendations. See 62 Fed. Reg. at 60,320. In 
response to OTAG's efforts, EPA engaged in further analysis 
and devised the SIP call challenged here.

 Industry/Labor petitioners argue that the CAA required 
EPA to convene a transport commission pursuant to sections 
176A/184 prior to issuing the challenged SIP call. EPA 
concedes that OTAG was not a statutorily-mandated 176A/184 
transport commission as defined in the CAA. If a transport 
commission is required, EPA would be bound by statute to 
follow certain procedures in establishing and executing its 
commission obligation. However, we hold that the CAA does 
not require EPA to establish such a commission.

 Industry/Labor petitioners contend that the reference to 
the transport commission provisions in section 110(k)(5) and 
the mandate of section 110(a)(2)(D) that SIP requirements be 
consistent with Title I provisions obligated EPA, prior to 
issuing the SIP call, to create a transport commission guided 
by the terms in sections 176A and 184 of the statute. 
Industry/Labor petitioners also note that sections 176A and 
184 reference both sections 110(a)(2)(D) and 110(k)(5). See 42 
U.S.C. ss 7506a(b)(2), (c), 7511c(c)(5). From this hodgepodge 
of largely unrelated cross-references, Industry/Labor peti-
tioners argue that EPA can only issue a section 110(k)(5) SIP 
call to enforce section 110(a)(2)(D)'s requirement after form-
ing a 176A/184 transport commission. We disagree.

 As a threshold matter, subsections 176A(a) and (b)(1) make 
clear that EPA must establish a transport commission if the 
agency exercises its discretion to create a transport region 
pursuant to section 176A(a). See 42 U.S.C. ss 7506a(a), 
(b)(1). However, EPA can address interstate transport apart 
from convening a 176A/184 transport commission as subsec-
tion (a) provides that EPA "may" establish a transport region 
and subsection (b)(1) only requires a transport commission 
upon the establishment of a transport region because 
"[w]henever the Administrator establishes a transport region 
under subsection (a) ..., the Administrator shall establish a 
transport commission." Moreover, the relevant section 184 
requirements apply to states within established transport 
regions. See 42 U.S.C. s 7511c(a)-(c). Thus, Industry/Labor 
petitioners cannot reason around the determinative statutory 
language contained in section 176A. Statutory construction is 
not an exercise in picking apart a complex statute and piecing 
the parts back togther in a manner to effect a particular end. 
Ideally, a statute's directive concerning a certain issue will be 
plain and clear. Just so here.

B. State-Specific Analysis

 Section 110(a)(2)(D)(I)(i) requires that the relevant offend-
ing emissions be "emissions activity within the State." Sever-
al petitioners charge that EPA did not sufficiently analyze 

each particular state in determining which states contributed 
unduly to ozone downwind.

 In issuing its Notice of Proposed Rulemaking ("NPRM"), 
EPA relied on data collected from OTAG. The data were 
multi-state and regional in nature and were framed as a 
model of how ozone was transported downwind from 12 
different regions that covered the eastern half of the United 
States. See Final Rule, 63 Fed. Reg. at 57,382. The OTAG 
regions do not track state boundaries, so several states are 
split between regions. EPA also relied upon the NOx emis-
sions of the individual states. See id. at 57,383-84. A 
potential shortcoming of the NPRM's approach was that it 
was too multi-state in nature. EPA knew how much NOx 
each state was emitting, but a state's emissions as a share of 
total emissions do not necessarily correspond proportionately 
to its share in the creation of ozone in downwind states. 
OTAG's multi-state modeling of such downwind transporta-
tion painted with a rather broad brush.

 We need not pass judgment on whether the evidence and 
approach of the NPRM would have supported the final rule. 
After receiving comments regarding the insufficiently state-
specific analysis of the NPRM, EPA performed state-specific 
modeling. Id. at 57,384. According to EPA, this confirmed 
the results of the regional modeling. Id.

 The two types of state-specific modeling go by the names 
UAM-V and CAMx. In the UAM-V approach, the research-
ers model an affected downwind area to establish a base case, 
and then "zero-out" a particular source state. Thus with 
UAM-V it can be estimated what ozone concentrations would 
be like if a particular state contributed no ozone or ozone 
precursors. The CAMx modeling, on the other hand, is a 
source apportionment analysis which tracks modeled ozone 
from its precursors (NOx and volatile organic compounds 
(VOCs)) through the formation of ozone and subsequent 
migration. Whereas UAM-V tells modelers how much ozone 
is missing when one state is zeroed out, CAMx models an 
ozone concentration and provides apportionment, i.e., who 
sent what. An advantage of the CAMx model used by EPA 

was that, unlike the UAM-V modeling, with CAMx EPA 
could isolate man-made emissions, or ozone creation based on 
reactions between man-made and biogenic emissions. 
UAM-V modeling was less discriminating.

 Petitioners really do nothing more than quibble with the 
state-specific modeling. For example, Industry/Labor peti-
tioners argue that zero-out modeling is inappropriate because 
it models an impossible scenario--the elimination of all man-
made NOx emissions; but they do not suggest how much this 
characteristic is likely to distort the results. State petitioners 
charge that sometimes the results of the two models were 
inconsistent, with, for example, the CAMx showing a larger 
migration of ozone from a state than the UAM-V showed for 
all man-made NOx in that state. EPA itself noted this 
infrequent inconsistency. See id. at 57,385. Neither criticism 
affords ground for non-expert judges to find a material 
likelihood of serious error. See Appalachian Power Co. v. 
EPA, 135 F.3d 791, 802 (D.C. Cir. 1998).

 Petitioners complain that EPA did not provide the data 
sooner. EPA made the new modeling available on the Inter-
net six weeks prior to the final rule, published its availability 
in the Federal Register a month before the final rule, and 
during that time received and responded to questions and 
comments regarding the modeling. Other than what we have 
already mentioned, petitioners have evidently not been able to 
identify further flaws in the modeling used, and thus have 
failed to show any prejudice from EPA's timetable. Personal 
Watercraft Indus. Ass'n v. Department of Commerce, 48 F.3d 
540, 544 (D.C. Cir. 1995).

C. Determining "Significant" Contribution

 Section 110(a)(2)(D)(i)(I) applies only to states that "con-
tribute significantly" to nonattainment in a downwind state. 
Petitioners make essentially four arguments challenging 
EPA's determination of "significance": (1) EPA acted con-
trary to precedent; (2) EPA considered forbidden factors, 
namely, costs of reduction; (3) EPA irrationally imposed 
uniform NOx controls on the states; (4) EPA's determination 

was so devoid of intelligible principles as to violate the 
nondelegation doctrine.

 1. Past Precedent
 
 Before the 1990 amendments to the Clean Air Act, 
s 110(a)(2)(E)(I) directed the EPA to insist on SIP provisions 
adequate to prevent sources within a state from emitting air 
pollution that would "prevent attainment or maintenance [of 
primary or secondary standards] by any other State." 42 
U.S.C. s 7410(a)(2)(E) (1982) (emphasis added). In a number 
of decisions EPA found, with approval of the courts, that 
various emissions of a particular state, having a proportionate 
impact on some downwind state greater than the impacts 
involved here, did not meet that standard. See New York v. 
EPA, 852 F.2d 574 (D.C. Cir. 1988); Air Pollution Control 
Dist. of Jefferson County v. EPA, 739 F.2d 1071 (6th Cir. 
1984); New York v. EPA, 716 F.2d 440 (7th Cir. 1983); New 
York v. EPA, 710 F.2d 1200 (6th Cir. 1983); Connecticut v. 
EPA, 696 F.2d 147 (2d Cir. 1982). According to the states, 
these decisions, and what they claim to be Congress's implicit 
endorsement in the 1990 amendments, bar EPA from regard-
ing the ozone emissions here as "significant" within the 
meaning of s 110(a)(2)(D)(i)(I). Thus the states would equate 
the old standard--"prevent attainment"--with the new stan-
dard: "contribute significantly to nonattainment."

 Nothing in the text of the new section or any other 
provision of the statute spells out a criterion for classifying 
"emissions activity" as "significant." Nor did EPA, under the 
then-existing provision, bind itself to any criterion. Further, 
given EPA's finding as to the cumulative effects of the 
pollutants that generate ozone, EPA might well be able to 
distinguish this case from the sulfur dioxide cases that the 
states have cited. See 63 Fed. Reg. at 57,359 ("The chemical 
reactions that create ozone take place while the pollutants are 
being blown through the air by the wind, which means that 
ozone can be more severe many miles away from the source 
of emissions than it is at the source."). But the states point 
to nothing suggesting any prior adoption by EPA of any 

binding concept of how much was too much, so the claim falls 
short at the threshold.

 2. Consideration of costs
 
 Petitioners claim s 110(a)(2)(D)(i)(I) does not permit EPA 
to take into consideration the cost of reducing ozone. The 
full section provides that SIPs must contain provisions ade-
quately prohibiting

 any source or other type of emissions activity within the 
 State from emitting any air pollutant in amounts which 
 will ... contribute significantly to nonattainment in, or 
 interfere with maintenance by, any other State with 
 respect to any such national primary or secondary am-
 bient air quality standard.
 
42 U.S.C. s 7410(a)(2)(D)(i)(I) (emphasis added).

 Before reviewing the petitioners' attacks we must first 
describe how EPA went about the business at hand. It first 
determined that 23 jurisdictions are "significant" contributors 
to downwind nonattainment. 63 Fed. Reg. 57,398. In mak-
ing this listing EPA drew lines based on the magnitude, 
frequency, and relative amount of each state's ozone contribu-
tion to a nonattainment area. For example, in one calculation 
it looked at the number of NOx parts per billion ("ppb") that a 
candidate state's emissions made to exceedances in specific 
downwind locations (examined as a proportion of those excee-
dances). Indiana was found to contribute at least 2 ppb to 
4% of the 1-hour ozone exceedances in New York City, and 
was deemed a "significant contributor" to nonattainment 
there. On the other hand, Alabama, Georgia, Massachusetts, 
Missouri, South Carolina, Tennessee, and Wisconsin were not 
deemed "significant contributors" to New York City nonat-
tainment because none of these states ever contributed more 
than 2 ppb to a 1-hour exceedance in that area. Although 
EPA looked at other measures, e.g., the percentage contribu-
tion of a state's emissions to total concentrations in a specified 
area, no one quarrels either with its use of multiple measures, 
or with the way it drew the line at this stage.

 Although the dividing line was a very low threshold of 
contribution, in the end EPA's rule called for termination of 
only a subset of each state's contribution. EPA decided that 
the 23 "significant contributors" need only reduce their ozone 
by the amount achievable with "highly cost-effective con-
trols." 63 Fed. Reg. at 57,403. Thus, once a state had been 
nominally marked a "significant contributor," it could satisfy 
the statute, i.e., reduce its contribution to a point where it 
would not be "significant" within the meaning of 
s 110(a)(2)(D)(i)(I), by cutting back the amount that could be 
eliminated with "highly cost-effective controls." EPA's de-
sign was to have a lot of states make what it considered 
modest NOx reductions, uniformly limited to ones that could 
be achieved (in EPA's estimate) for less than $2000 a ton. As 
a result, naturally, the ultimate line of "significance," whether 
measured in volume of NOx emitted or arriving in nonattain-
ment areas, would vary from state to state depending on 
variations in cutback costs.

 State and Industry/Labor petitioners argue that this ap-
proach runs afoul of s 110(a)(2)(D), which they read as pro-
hibiting any consideration of costs or cost-effectiveness in 
determining what contributions are "significant." So far as 
appears, none of the states proposes that EPA, if reversed, 
must require complete extirpation of their NOx emissions. 
Rather, the gamble--at least of the small contributors--is 
evidently that if EPA were barred from considering costs, it 
would never have included such states. Because the attacks 
from the states and Industry/Labor are somewhat dissimilar 
and have shifted back-and-forth between the opening briefs, 
reply briefs, and oral argument, a summary of the relevant 
differences and vacillations is in order. We note that no 
party makes any claim that EPA was either confined to 
adopting rules whose benefits exceeded their costs, or permit-
ted to use that criterion in selecting its final rule.2 Nor has it 

__________
 2 Indeed, accepting EPA's belief that ozone cannot be held re-
sponsible for mortality effects, see Proposed Rule, 62 Fed. Reg. at 
60,321 (not listing death as a health effect of groundlevel ozone); 
compare Final Rule, 63 Fed. Reg. at 57,359 (listing "[p]ossible long-

been argued that the term "significant" required consider-
ation of costs.

 State petitioners initially argued that it was "arbitrary and 
unlawful" for EPA to make cost effectiveness a "controlling 
factor" or "linchpin" in the determination of significant contri-
bution under s 110(a)(2)(D). Thus EPA's error, as the states 
would have it, was in considering costs too much: "Petitioning 
States do not claim that there is no role for cost consider-
ations; Petitioning States simply stress that EPA must estab-
lish a definition of significance that is dominated by air 
quality factors, as air quality is the sole factor mentioned in 
the statute." Reply Br. of Petitioning States at 4. In 
support of this position, State petitioners cited our en banc 
decision in Natural Resources Defense Council v. EPA, 824 
F.2d 1146, 1163 (D.C. Cir. 1987) (en banc), where we held that 
a statutory mandate for EPA to set a standard with an 
"ample margin of safety to protect the public health" did not 
preclude the consideration of costs and technological feasibili-
ty, but that these concerns could not be the "primary consid-
eration."

 At oral argument, counsel for the states abandoned this 
position and decided that the statute flatly prohibits EPA 
from considering costs at all. Transcript of Oral Argument at 
14-17. Indeed, counsel eventually went so far as to claim 
that if faced with two states, one of which could eliminate all 
relevant emissions at a trivial cost, while the other could 
eliminate none at a cost of less than $5000 a ton, EPA must 
mandate the same cutback for each. Id. at 16-17.

__________
term damage to the lungs or even premature death" as health 
effects), and mainly using EPA data, some outside observers have 
calculated the benefit per ton of NOx reduction as ranging from a 
high of $750 per ton (for mobile sources in certain areas) to a low of 
negative $6 per ton (for other mobile sources). Alan Krupnick & 
Virginia McConnell, "Cost-Effective NOx control in the Eastern 
U.S." (Draft July 1999) (Table 4); see Krupnick & Anderson, A 
Dilemma Downwind, 137 Resources for the Future 5, 7 (1999) ("If 
one assumes that ozone does not cause deaths, the EPA's proposal 
is much too restrictive, incurring costs far out of proportion with 
the benefits it would bring.").

 We should note here that the consequence of this position 
is not so extreme as it sounds. EPA's rule allows ton-for-ton 
emissions trading between firms based on allowances deter-
mined by each state. See 63 Fed. Reg. 57,456. Obviously the 
firms with the highest emission reduction costs will, if permit-
ted by their states, buy up pollution allowances from firms 
that are granted allowances because they have over-
controlled for NOx--firms, obviously, with low reduction 
costs. If transaction costs were zero, the only effect of the 
initial assignment of cutbacks would be distributional: firms 
would make only the cheaper cutbacks, but firms with high 
emission-reduction costs would buy allowances from those 
with low costs and thereby transfer wealth to them. See 
Ronald H. Coase, The Problem of Social Cost, 3 J. L. & Econ. 
1 (1960). But transaction costs notoriously are not zero;3 so 
the likely effect of the proposed statutory interpretation 
would be that any aggregate cutback would be achieved at 
considerably higher cost than under EPA's reading of 
s 110(a)(2)(D)(i)(I), with absolutely no offsetting environmen-
tal benefit to the public. Of course we are able to assume the 
existence of EPA's allowance trading program only because 
no one has challenged its adoption. As the program seems to 
have no rationale other than cost reduction, see 63 Fed. Reg. 
at 57,457, it would presumably be invalid under petitioners' 
proposed reading of s 110(a)(2)(D)(i)(I), in which case the 
states' position really is as extreme as it sounds.

 Returning to the positions of the parties, we find Indus-
try/Labor engaging in a migration comparable to that of the 
states, though in the opposite direction. In its opening and 
reply brief Industry/Labor argued that "s 110(a)(2)(D) re-
quires consideration of only air quality impacts in determin-
ing the significance of any contribution." However, at oral 
argument Industry/Labor offered a construction of the stat-
ute that seemed to restore to EPA via s 110(k)(5) what it 
would take away via s 110(a)(2)(D). Industry/Labor claimed 

__________
 3 A glance at EPA's regulations for allowance trading will con-
vince any doubter that transaction costs can safely be expected to 
be substantial. See 63 Fed. Reg. at 57,457-75.

that costs could be considered when EPA determines if a SIP 
is "adequate" under s 110(k)(5). Transcript of Oral Argu-
ment at 28. The states actually offered this same reading of 
s 110(k)(5) in their reply brief (back when they thought EPA 
could consider costs) but appeared to abandon it at oral 
argument in favor of a flat prohibition on EPA cost consider-
ations. The argument that costs may be considered under 
s 110(k)(5) seems to concede that the structure of the statu-
tory scheme manifests no intention to bar the consideration of 
costs.

 And so we are indeed presented with the question whether 
s 110(a)(2)(D) bars consideration of costs, but it is presented 
to us with the caveat that costs can be considered later on in 
the process, and accompanied by a false start by the states, 
who initially said that EPA could consider costs, just not too 
much. Against this backdrop, it would be at the very least 
ironic for us to say there is "clear congressional intent to 
preclude consideration of cost" under s 110(a)(2)(D). See 
Natural Resources Defense Council v. EPA, 824 F.2d 1146, 
1163 (D.C. Cir. 1987) (en banc).

 For convenience we repeat the statutory language. Section 
110(a)(2)(D)(i)(I) provides that SIPs must contain provisions 
adequately prohibiting

 any source or other type of emissions activity within the 
 State from emitting any air pollutant in amounts which 
 will ... contribute significantly to nonattainment in, or 
 interfere with maintenance by, any other State with 
 respect to any such national primary or secondary am-
 bient air quality standard.
 
42 U.S.C. s 7410(a)(2)(D)(i)(I) (emphasis added). By its 
terms the statute is focused on "amounts" of "emissions 
activity" that "contribute significantly to nonattainment." 
The fundamental dispute is over the clarity of the phrase 
"contribute significantly." Must EPA simply pick some flat 
"amount" of contribution, based exclusively on health con-
cerns, such that any excess would put a state in the forbidden 

zone of "significance"?4 Or was it permissible for EPA to 
consider differences in cutback costs, so that, after reduction 
of all that could be cost-effectively eliminated, any remaining 
"contribution" would not be considered "significant"? In 
deciding on the permissible ceiling, EPA used "significant" in 
the second way.

 The term "significant" does not in itself convey a thought 
that significance should be measured in only one dimension--
here, in the petitioners' view, health alone. Indeed, "signifi-
cant" is a very odd choice to express unidimensionality; 
consider the phrase "significant other." In some contexts, 
"significant" begs a consideration of costs. In finding a 
threshold requirement of "significant risk" in s 3(8) of the 
Occupational Health and Safety Act, 29 U.S.C. s 652(8), a 
plurality of the Supreme Court understood a "significant" risk 
as something more than a "mathematical straitjacket," and 
held that "[s]ome risks are plainly acceptable and others are 
plainly unacceptable." Industrial Union Dept., AFL-CIO v. 
American Petroleum Institute ("Benzene"), 448 U.S. 607, 655 
(1980) (plurality opinion). The plurality withheld judgment 
on whether the Act required a "reasonable correlation be-
tween costs and benefits," id. at 615, but the upshot of 
inserting the adjective "significant" was a consideration of 
which risks are worth the cost of elimination. OSHA has 
since interpreted s 3(8) and regulation of "significant risk" to 
require "cost-effective protective measures" and set stan-
dards with an eye toward "the costs of safety standards 
[being] reasonably related to their benefits." See Interna-
tional Union v. OSHA (Lockout/Tagout II), 37 F.3d 665, 668-
69 (D.C. Cir. 1994) (quoting OSHA's final rule). OSHA's 
reaction to the term "significant" seems to confirm what some 
commentators have asked rhetorically: "[C]an an agency 
sensibly decide whether a risk is 'significant' without also 
examining the cost of eliminating it?" Stephen G. Breyer, 

__________
 4 We deal below with a related question: Did EPA act irrationally 
in setting the level of significance without regard for varying levels 
of downwind impact? See part I.C.3 below.

Richard B. Stewart, Cass R. Sunstein & Matthew L. Spitzer, 
Administrative Law and Regulatory Policy 65 (4th ed. 1999).

 Petitioners conspicuously fail to describe the intellectual 
process by which EPA would determine "significance" if it 
may consider only health. EPA has determined that ozone 
has some adverse health effects--however slight--at every 
level. See National Ambient Air Quality Standards for 
Ozone, 62 Fed. Reg. 38,856 (1997). Without consideration of 
cost it is hard to see why any ozone-creating emissions should 
not be regarded as fatally "significant" under 
s 110(a)(2)(D)(i)(I). Perhaps EPA might (under such a rule) 
let the upwind states off at the stringency level of the 
programs imposed on non-attainment areas, but petitioners 
do not explain how "significance" can exclude cost but admit 
equity.

 Although the ambiguity of the word "significant" and the 
implications of a health-only reading are potentially fatal 
flaws in petitioners' theory (aside from their own inability to 
discern the "plain language" consistently), the most formida-
ble obstacle is the settled law of this circuit. It is only where 
there is "clear congressional intent to preclude consideration 
of cost" that we find agencies barred from considering costs. 
NRDC, 824 F.2d at 1163; see also George E. Warren Corp. v. 
EPA, 159 F.3d 616, 622-24 (D.C. Cir. 1998), reh'g granted, 
164 F.3d 676 (D.C. Cir. 1999); Grand Canyon Air Tour 
Coalition v. FAA, 154 F.3d 455, 475 (D.C. Cir. 1998), cert. 
denied, 119 S. Ct. 2046 (1999); NRDC v. EPA, 937 F.2d 641, 
643-46 (D.C. Cir. 1991); cf. International Bhd. of Teamsters 
v. United States, 735 F.2d 1525, 1528-29 (D.C. Cir. 1984) 
(construing mandate to adopt "reasonable requirements" for 
safety as allowing consideration of cost).

 In NRDC we considered s 112 of the Clean Air Act, 
requiring EPA to set an air quality standard for hazardous 
pollutants with an "ample margin of safety" to protect the 
public health. We held that this phrase did not preclude a 
consideration of costs. 824 F.2d at 1155, 1163. In George E. 
Warren Corp. we acknowledged that the statutory scheme for 
the reformulated gasoline program had the "overall goal" of 

improving air quality and "reducing air pollution." 159 F.3d 
at 622. But because there was nothing "in the text or 
structure of the statute to indicate that the Congress intend-
ed to preclude the EPA from considering the effects a 
proposed rule might have upon the price and supply of 
gasoline," id. at 623, we found no such preclusion even though 
the provision at issue contained no allusion whatever to such 
effects. Similarly, in Grand Canyon Air Tour the statute 
required the FAA to devise a plan for "substantial restoration 
of the natural quiet" in the Grand Canyon area, but we found 
nothing impermissible in the FAA's consideration of costs to 
the air tourism industry in deciding how "substantial" that 
restoration must be. 154 F.3d at 475. In NRDC v. EPA we 
considered whether EPA permissibly used cost-benefit analy-
sis in refusing to classify a particular polluting source as 
"major." The petitioners argued that cost considerations 
were precluded, and we stated: "[W]hile the statutory lan-
guage and legislative history do not bar petitioners' construc-
tion, they provide little support and no necessity for it." 937 
F.2d at 645. We affirmed EPA's use of cost-benefit analysis.

 These cases are unexceptional in their general view that 
preclusion of cost consideration requires a rather express 
congressional direction. See Edward W. Warren & Gary E. 
Marchant, "More Good Than Harm": A First Principle for 
Environmental Agencies and Reviewing Courts, 20 Ecology 
L.Q. 379, 421 (1993) ("The need to compare benefits and costs 
has long played a role in judicial review of agency actions 
regulating health and safety risks."); Cass R. Sunstein, Inter-
preting Statutes in the Regulatory State, 103 Harv. L. Rev. 
405, 487 (1989) (suggesting an "interpretive principle" drawn 
from case law, including NRDC v. EPA, 824 F.2d 1146, that 
reviewing courts will read statutes as authorizing regulations 
with benefits at least "roughly commensurate with their costs, 
unless there is a clear legislative statement to the contrary"). 
Three of the cases, moreover--the two NRDC cases and 
Grand Canyon--, involve statutory language with just the 
same structure as here. A mandate directed to some envi-
ronmental benefit is phrased in general quantitative terms 
("ample margin of safety," "substantial restoration," and "ma-

jor"), and contains not a word alluding to non-health trade-
offs; in each case we found that in making its judgments of 
degree the agency was free to consider the costs of demand-
ing higher levels of environmental benefit. So too here.

 Petitioners point to no evidence of the requisite "clear 
congressional intent to preclude consideration of cost." 
NRDC, 824 F.2d at 1163. The text, we have already seen, 
works no such preclusion. As for the statutory structure, 
petitioners willingly concede that costs may be considered 
under s 110(k)(5) in determining the adequacy of a state plan. 
Why would a Congress intent on precluding cost consider-
ations allow such an escape hatch? The petitioners cite no 
legislative history suggesting that cost considerations should 
be barred.

 In sum, there is nothing in the text, structure, or history of 
s 110(a)(2)(D) that bars EPA from considering cost in its 
application.

 3. Uniform Controls
 
 As we have seen, EPA required that all of the covered 
jurisdictions, regardless of amount of contribution, reduce 
their NOx by an amount achievable with "highly cost-effective 
controls." Petitioners claim that EPA's uniform control 
strategy is irrational in two distinct ways. First, they ob-
serve that where two states differ considerably in the amount 
of their respective NOx contributions to downwind nonattain-
ment, under the EPA rule even the small contributors must 
make reductions equivalent to those achievable by highly 
cost-effective measures. This of course flows ineluctably 
from the EPA's decision to draw the "significant contribu-
tion" line on a basis of cost differentials. Our upholding of 
that decision logically entails upholding this consequence.

 The second objection is that because of distance and the 
vagaries of pollutant migration and ozone formation, a mole-
cule of NOx emitted in Indiana (for example) may cause far 
less adverse health impact than a molecule emitted in eastern 
Pennsylvania. EPA acknowledges that "[s]ources that are 
closer to the nonattainment area tend to have much larger 

effects on air quality than sources that are far away." 63 
Fed. Reg. at 25,919. While EPA's cost-effectiveness standard 
and emissions trading seem to mean that EPA will secure the 
resulting aggregate NOx reduction at roughly the lowest 
possible cost, they do not necessarily mean that it will have 
secured the resulting aggregate health benefits at the lowest 
cost. Petitioners ask, in effect, why EPA did not, by one 
means or another (e.g., in the emissions trading system), 
make reductions from sources near the nonattainment areas 
(or otherwise more damaging, molecule for molecule) more 
valuable than ones from distant sources?

 EPA considered this approach, modeling the efficacy of 
regional alternatives compared to its uniform strategy. See 
Final Rule, 63 Fed. Reg. at 57,423. Its researchers found 
that non-uniform regional approaches by comparison did not 
"provide either a significant improvement in air quality or a 
substantial reduction in cost." Id. The complaining states 
offer no material critique of EPA's methodology in reaching 
this answer, which in fact some independent investigators 
have confirmed. See Krupnick & Anderson, A Dilemma 
Downwind, 137 Resources for the Future 5, 6 (1999) ("[Even 
with] spatial differences, when viewed across the entire study 
region, RFF concluded that there was no clear benefit to an 
exposure-based trading system, compared with simple ton-
for-ton NOx trading. Public health benefits would be approx-
imately the same, and there would be no significant difference 
in costs to the utilities."). We have no basis to upset EPA's 
judgment.

 4. Nondelegation
 
 In their opening brief and more prominently in their reply 
brief, state petitioners argue that EPA has not determined 
"significant contribution" based on any intelligible principles. 
Petitioners rely heavily on our decision in American Truck-
ing Ass'ns, Inc. v. EPA, 175 F.3d 1027, reh'g granted in part, 
den'd in part 195 F.3d 4 (D.C. Cir. 1999), essentially arguing 
that nothing about EPA's analysis explains how much of a 
NOx contribution was too much (i.e., worthy of a SIP call).

 We must recognize here that EPA's cost-effectiveness cri-
terion is a radically incomplete line-drawing device. EPA has 
effectively ruled that each affected state must get down to the 
NOx emissions levels that would prevail if it removed all NOx 
emissions costing $2000/ton or less to remove. This satisfies 
its "cost-effectiveness" criterion because (if states also seek to 
minimize costs subject to the EPA's constraint) only these 
relatively low-cost tons will be removed. But while EPA 
indicates that it rested the $2000/ton figure on "NOx emis-
sions controls that are available and of comparable cost to 
other recently undertaken or planned NOx measures," Final 
Rule, 63 Fed. Reg. at 57,400, it neither rests that benchmark 
on anything in the language or function of s 110(a)(2)(D)(i)(I), 
nor otherwise explains why the resulting cut-off point repre-
sents the right degree of "cost-effectiveness" (i.e., why "high-
ly cost-effective" should be at that "height"). Accordingly, we 
must read EPA as having understood that its selection of the 
cut-off point was essentially unbounded.

 But petitioners have ignored a limit to the nondelegation 
doctrine that we relied on in American Trucking and even 
more emphatically in its immediate precursor, International 
Union, UAW v. OSHA ("Lockout/Tagout I"), 938 F.2d 1310 
(D.C. Cir. 1991). There we noted that the scope of the 
agency's "claimed power to roam" was "immense, encompass-
ing all American enterprise." Id. at 1317. Quoting verbatim 
from Synar v. United States, 626 F. Supp. 1374, 1383 (D.D.C. 
1986) (three-judge panel), aff'd sub nom. Bowsher v. Synar, 
478 U.S. 714 (1986), we said, "When the scope increases to 
immense proportions, as in [A.L.A. Schecter Poultry Corp. v. 
United States, 295 U.S. 495 (1935)], the standards must be 
correspondingly more precise." Lockout/Tagout I, 938 F.2d 
at 1317. We noted that a mass of cases in courts had upheld 
delegations of effectively standardless discretion, and distin-
guished them precisely on the ground of the narrower scope 
within which the agencies could deploy that discretion. Id. 
American Trucking, perhaps too succinctly for petitioners to 
notice, incorporated the Lockout/Tagout I discussion of the 
point. American Trucking, 175 F.3d at 1037.

 Nominally, of course, s 110(a)(2)(D)(i)(I) encompasses "all 
American enterprise." But as a practical matter EPA must 
make a number of threshold determinations that in practice 
appear to have confined the statute to a modest role. Before 
assessing "significance," EPA must find (1) emissions activity 
within a state; (2) show with modeling or other evidence that 
such emissions are migrating into other states; and (3) show 
that the emissions are contributing to nonattainment. We do 
not mean to minimize the scope of EPA's action in the 
present case. Nearly half of the nation is affected and 
control costs will be substantial. And it may ultimately prove 
that the dam constituted by these criteria will burst, subject-
ing "all American industry" to EPA's s 110(a)(2)(D)(i)(I) dis-
cretion. But in practice, so far, these threshold criteria 
appear to have so limited EPA's activity under the section as 
to make the rule in question here the sole example of 
s 110(a)(2)(D)(i)(I) rulemaking. Accordingly, the grounds on 
which we remanded in Lockout-Tagout I and American 
Trucking for confining agency constructions are absent here.

 II. Inclusion of Specific States

A. Wisconsin

 Wisconsin industry petitioners separately challenge Wis-
consin's inclusion in the SIP call. The Wisconsin petitioners 
argue that the emissions from the state do not contribute 
significantly to nonattainment in any other state. Section 
110(a)(2)(D)(i)(I) requires that a state "contribute significantly 
to nonattainment in ... any other State" in order to be 
included in the challenged SIP call. 42 U.S.C. 
s 7410(a)(2)(D)(i)(I) (emphasis added). As explained below, 
EPA erroneously included Wisconsin in the SIP call because 
EPA failed to explain how Wisconsin contributes to nonattain-
ment in any other state.

 EPA contends that Wisconsin contributes significantly to 
other states' nonattainment because the state significantly 
contributes ozone over the Lake Michigan region. Despite 
EPA's Lake Michigan concerns, the agency does not show on 
the record that Wisconsin's ozone contribution affects any 

onshore state nonattainment. At oral argument, counsel for 
EPA conceded that "[t]he part that's missing [from the 
record] is a thorough explanation to support our modeling 
data and things of that nature between the Lake Michigan 
receptor area and the onshore states." Oral Arg. Tr. at 107. 
When asked for more, counsel could only respond that "the 
best evidence ... is simply the narrative statements in the 
[final rule's] preambles.... There's nothing else there." Id. 
Because EPA conceded at oral argument that it has no record 
evidence directly linking Wisconsin's ozone contribution over 
Lake Michigan to nonattainment in any state and because 
EPA must "demonstrate[ ] a reasonable connection between 
the facts on the record and its decision" made pursuant to its 
statutory authority, Ethyl Corp. v. EPA, 51 F.3d 1053, 1064 
(D.C. Cir. 1995), we hold that EPA acted unlawfully by 
including Wisconsin in a SIP call limited by statute to states 
contributing significantly to nonattainment in any other state 
and therefore set aside Wisconsin's inclusion in the SIP call. 
See 5 U.S.C. s 706(2)(A), (C) (1994) ("The reviewing court 
shall ... hold unlawful and set aside agency action ... found 
to be ... arbitrary, capricious, an abuse of discretion, or 
otherwise not accordance with law [or] in excess of statutory 
jurisdiction, authority, or limitations, or short of statutory 
right.").

B. Missouri and Georgia

 Missouri and Georgia were on the geographical perimeter 
of EPA's SIP call. No state west of Missouri was included, 
nor were the two states directly to its north (Iowa and 
Minnesota) and south (Arkansas). Georgia was a bit more in 
the thick of things, surrounded on three sides by included 
states--Alabama, Tennessee, North Carolina, and South Car-
olina; but the southern portion of Georgia borders the ex-
cluded state of Florida. Industrial petitioners within Mis-
souri and Georgia challenge EPA's decision to calculate NOx 
budgets for these two states based on the entirety of NOx 
emissions in each state. Petitioners argue that there is 
record support only for the proposition that emissions from, 
roughly speaking, the eastern half of Missouri and the north-
ern two-thirds of Georgia "contribute" to downwind concen-

trations; accordingly, they say, the NOx budgets for Missouri 
and Georgia should be based solely on those emissions.

 We must here explain how EPA calculated NOx budgets. 
It projected the total amount of NOx emissions that sources in 
a state would emit in the year 2007, in light of expected 
growth and other controls required by the CAA. EPA then 
projected total NOx emissions if "highly cost-effective con-
trols" were implemented. The resulting calculation became 
the state's NOx budget, with the difference between the base 
case and the controlled case being the "significant" contribu-
tion discussed above. Obviously a state's NOx budget will 
vary depending on whether EPA considers all of the NOx 
emissions in the state, or instead considers only emissions 
located in a smaller portion of the state (assuming emissions 
are dispersed throughout the state, which is the case here 
and without which the issue would be immaterial, as nonexis-
tent emissions need not be controlled). For Missouri and 
Georgia, as for all other included states, NOx budgets were 
calculated using all NOx emissions in the state.

 The challenge basically stems from the character of 
OTAG's modeling, and its resulting recommendations to EPA. 
OTAG's ozone transport model used grids drawn across most 
of the eastern half of the United States. The first grid was 
the most precise, with grid cells of 12 kilometers squared (244 
square kilometers)--the "fine grid." A second grid extended 
beyond the perimeter of the fine grid and had cells of 36 
kilometers squared resolution--the "coarse grid." For a 
variety of reasons to be discussed shortly, the fine grid did 
not track state boundaries, and Missouri and Georgia were 
among several states that were split between the fine and 
coarse grids. OTAG then ran modeling for both grids, but in 
the final analysis did not find emissions from the coarse grid 
worthy of special concern. OTAG's executive summary stat-
ed: "[T]he focus on ozone air quality impacts in the fine grid 
raised questions about the need for controls in the coarse 
grid. The recommendations adopted by the Policy Group 
recognize that the OTAG analyses demonstrated that trans-
port impacts of the coarse grid areas on the fine grid are 
minimal and therefore, do not include the coarse grid areas 

for recommended control measures other than those that 
would be applied nationally." Petitioners argue that EPA 
should base NOx budgets for Missouri and Georgia only on 
portions of these states within the fine grid.

 EPA offers three reasons for including the entire states of 
Missouri and Georgia:

 (1) The division of individual States by OTAG was based, 
 in part, on computational limitations in OTAG's modeling 
 analyses; (2) the additional upwind emissions from full, 
 as opposed to partial, States would provide additional 
 benefit to downwind nonattainment areas; and, (3) State-
 wide emissions budgets create fewer administrative diffi-
 culties than a partial-State budget.
 
Final Rule, 63 Fed. Reg. at 57,424. We review deferentially, 
searching for the reasonableness of EPA's action, Appala-
chian Power, 135 F.3d at 802, whether that be EPA's inter-
pretation of the statute, see Chevron, 467 U.S. at 842-43, or 
EPA's explanation for its policy choice, see Motor Vehicle 
Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 
29, 43 (1983). The two inquiries can and do overlap. See 
Animal Legal Defense Fund v. Glickman, No. 97-5009, slip 
op. at 9 (D.C. Cir. Feb. 1, 2000).

 On its face the statute neither mandates nor prohibits an 
all-or-nothing statewide perspective. It directs EPA to make 
sure that SIPs (which of course are state plans) adequately 
prohibit "any source or other type of emissions activity within 
the State from emitting" in excess of the substantive limit. 
The critical issue is whether the targeted "source" or "emis-
sions activity" "contribute[s] significantly to nonattainment" 
in another state.

 EPA's first argument is that the fine grid split Missouri 
and Georgia in part because of computer limitations--every 
extension of the fine grid modeling was costly in terms of 
both computer memory and data collection. Document No. 
II-A-14, Draft OTAG Final Report Regional and Urban 
Scale Modeling--Chapter 2, 2-7 (undated). But the OTAG 

modelers allocated their scarce resources purposefully, by 
reference to known air quality data, explicitly taking into 
consideration the "locale of various problem areas (as repre-
sented by urban-area modeling domains), and emissions den-
sity." Id. Thus it was no mere techno-fortuity that the fine 
grid included enough of Missouri to include the city of St. 
Louis and enough of Georgia to include Atlanta: both cities 
are designated nonattainment areas for ozone under the 
1-hour NAAQS. See Final Rule, 63 Fed. Reg. at 57,359. 
Moreover, the fine grid portions of both states are the closest 
to other nonattainment areas, such as Chicago and Birming-
ham, and generally higher ozone density.

 Of course the fine grid modeling of parts of Missouri and 
Georgia showed emissions in the aggregate meeting the 
EPA's threshold "contribution" criteria. Thus fine grid mod-
eling of each in its entirety would presumably also have done 
so. But that is a simple arithmetic necessity (a state is 
necessarily composed of its parts) and provides no reason for 
EPA to ignore the very air quality factors that influenced the 
design of the modeling that did occur. OTAG itself clearly 
did not think those factors magically lost their force, for it 
recommended against controlling the rump areas. And EPA 
itself acknowledged part of the reason this should be so when 
it observed, "Sources that are closer to the nonattainment 
area tend to have much larger effects on air quality than 
sources that are far away." 63 Fed. Reg. at 25,919. Indeed, 
even if the line between areas for which there was evidence 
and ones for which there was none were explained solely by 
fortuity, EPA would still be required to act upon the evidence 
that was generated. See Chemical Manufacturers Ass'n v. 
EPA, 859 F.2d 977, 989 (D.C. Cir. 1988) (holding that EPA 
must consider "all the evidence--including the industry evi-
dence").

 This leads us to EPA defenses other than modeling design. 
The first is that "the larger the geographic area that is 
controlled, the greater the downwind benefits." Final Rule, 
63 Fed. Reg. at 57,424. This reason can only stand if the 
emissions at issue contribute significantly to nonattainment in 
another state. OTAG concluded they did not. Id. EPA 

claims that its state-specific modeling, which supplemented 
OTAG's more regional modeling, supports including the 
coarse grid areas. See id. Yet EPA's explanation and 
technique make clear that emissions from the fine grid areas 
may have been the sole source of the finding. Indeed, EPA 
says as much: "[I]f emissions from part of a State contribute 
significantly to downwind nonattainment or maintenance 
problems, emissions from the entire State contribute signifi-
cantly to downwind nonattainment or maintenance problems." 
Id. This of course is also true as a matter of logic (a state is 
the sum of its parts). But it is completely consistent with the 
rump portion being innocent of downwind effect, and thus is 
scarcely a reason for ruling that significant contributions 
from a border city should rope in the entire state.

 Aware of this problem, EPA simply throws the burden of 
persuasion onto the states. "[T]here is no peculiar meteoro-
logical phenomenon that would indicate that emissions from 
some portion of [each of the affected states] would not impact 
downwind nonattainment or maintenance problems." Id. In 
addition, "the atmosphere is constantly in motion and has no 
limitations at geo-political boundaries." Id. If this is "evi-
dence" of contribution, it proves too much. If the simple 
proposition that the prevailing westerlies carry pollutants 
eastward were enough, EPA could, on the basis of a plant in 
Pennsylvania, use s 110(a)(2)(D)(i)(I) to control all NOx emis-
sions east of the Rocky Mountains. While we uphold EPA's 
determination that a "significant" contribution is a cost-
effectively controllable contribution, EPA must first establish 
that there is a measurable contribution. Interstate contribu-
tions cannot be assumed out of thin air.

 In the end administrative convenience is EPA's only real 
defense for basing NOx budgets on the entirety of a state's 
emissions. There seem to be two species of this argument. 
First, EPA seems to claim that it is just easier to calculate a 
NOx budget based on all the emissions in the state instead of 
only a portion of such emissions. EPA provides no explana-
tion of why this is so, and it seems dubious. Within a state 
are counties, air quality control regions, and for some unfor-
tunate states, nonattainment areas. EPA also has emissions 

data on specific sources, some of which may be susceptible of 
"highly cost-effective controls," and others of which may not 
be. See, e.g., Emissions Data For Power Plants, 
<www.epa.gov/acidrain/emissions> (visited January 26, 
2000). Without data from such state subdivisions and specific 
sources, EPA could never have performed modeling or even 
set a statewide budget. EPA has not explained how calcula-
tion of a budget for sources in only half of the state would be 
any more onerous than for all sources in the state. Unless it 
is relying on data that exist only for the state as a whole, 
calculation seems on its face easier for a half than for a whole.

 EPA offers a second administrative problem. If the con-
cern for not allowing s 110(a)(2)(D)(i)(I) to encompass un-
proven areas compels an insistence on proof of contribution 
from ever smaller geographic subdivisions, any area's specific 
contribution may appear insubstantial, even though collective-
ly there are significant contributions. In other words, unlike 
bologna, which remains bologna no matter how thin you slice 
it, significant contribution may disappear if emissions activity 
is sliced too thinly.

 While this argument was stressed on appeal, it is nowhere 
to be found in the proposed or final rule, except insofar as it 
may have lurked behind the vague invocation of "administra-
tive difficulties." See Final Rule, 63 Fed. Reg. at 57,424; 
Proposed Rule, 62 Fed. Reg. at 60,342. As a result it is quite 
undeveloped. But it appears to be based on a distortion of 
the claims of Missouri and Georgia. They are not asserting a 
right to bologna tactics, to slice down the unit of measure-
ment to a point of insignificance. All they are claiming is that 
where the data--calculated under EPA's supervision--incul-
pate part of a state and not another, EPA should honor the 
resulting findings.

 Such a proposition would of course leave EPA free to select 
states as the unit of measurement. In turn, states (or the 
areas of states that believed themselves innocent of material 
contributions, or sources located therein), might respond by 
offering finer-grained computations. Such a process seems 

more like a healthy search for truth than the collapse into 
infinite regress that EPA claims to fear.

 EPA also points to state flexibility: "Since each State has 
the flexibility to determine which sources to control in order 
to meet the budget, a State can structure its control strategy 
to require fewer reductions in certain portions of the State 
and greater controls in other areas." Final Rule, 63 Fed. 
Reg. at 57,424. This theory presents at least two difficulties. 
First, it overlooks the fact that state budgets not only encom-
pass the whole state but are calculated on the basis of 
hypothesized cutbacks from areas that have not been shown 
to have made significant contributions. Thus the "flexibility" 
comes at the cost of a burden that is heavier in the aggregate, 
where the added weight accomplishes no purpose relevant to 
s 110(a)(2)(D)(i)(I). Second, a state's use of flexibility to 
pursue a purely in-state set of tradeoffs between cost and 
benefit (and thus unrelated to the goals of s 110(a)(2)(D)(i)(I)) 
may actually diminish the cutbacks in areas that are making 
a contribution to other states' nonattainment.

 Thus nowhere has EPA reasonably explained why NOx 
budgets based on every state source are the best stopping 
point with respect to states on the perimeter of the ozone 
problem.

 Therefore we vacate EPA's final rule with respect to 
Missouri and Georgia and remand to the agency for reconsid-
eration in light of this opinion.

C. South Carolina

 Petitioner Santee Cooper challenges South Carolina's inclu-
sion in the SIP call by alleging that the state's downwind 
ozone nonattainment impact is "minuscule" and therefore not 
significant. We will hold unlawful EPA's decision to include 
South Carolina in the SIP call if we find EPA's decision 
"arbitrary, capricious, an abuse of discretion, or otherwise not 
accordance with law." 5 U.S.C. s 706(2)(A). In order for 
EPA's decision to include South Carolina in the SIP call to 
survive review, the agency must "demonstrate[ ] a reasonable 
connection between the facts on the record and its decision," 

Ethyl Corp., 51 F.3d at 1064. We conclude that the record 
supports EPA's decision to include the state as a significant 
contributor to downwind nonattainment. See Proposed Rule, 
62 Fed. Reg. at 60,337-339. EPA considered the analyses 
submitted by the objecting petitioner but disagreed with the 
petitioner's conclusions as drawn from the relevant informa-
tion. Specifically, EPA conducted additional modeling and 
interpreted the data in context and found that South Carolina 
significantly contributed to ozone nonattainment. See id.; 
Final Rule, 63 Fed. Reg. at 57,394-396.

 For example, under the 1-hour standard, the UAM-V zero-
out modeling results indicated that South Carolina had a high 
maximum contribution (16 ppb) and a high frequency of 
contribution (at least 2 ppb to 15% of the exceedences and at 
least 10 ppb to 5% of the exceedences) to Atlanta. See 
Office of Air and Radiation, U.S. Environmental Protection 
Agency, Doc. No. VI-B-11, Air Quality Modeling Technical 
Support Document for the NOx SIP Call C-5, H-2 (1998). 
The CAMx modeling results were comparable (25 ppb maxi-
mum contribution and a frequency of at least 2 ppb to 30% of 
the exceedences). See id. at C-5, G-6. Among the upwind 
states, only Alabama had a higher maximum contribution. 
See id. at Apps. G & H. Moreover, South Carolina's contribu-
tion to 1-hour nonattainment in Atlanta was no more "insig-
nificant" than many of the other linkages that were found to 
be significant (e.g., Indiana's contribution to New York City). 
See id. at C-13, H-16.

 In contrast, the petitioner seeks to show that the data, 
when viewed in isolation, makes South Carolina's contribution 
appear insignificant. In the end, we reject the challenge 
made on behalf of South Carolina because the petitioner 
attacks, not so much the accuracy of EPA's data, but rather 
EPA's reasonable analysis and application of the data.

 III. Federalism and Regulatory Flexibility Act

A. NOx Budgets

 Building on OTAG's work, EPA ordered the challenged 
SIP call under the authority of section 110(k)(5) in order to 

address significant contribution to 1-hour ozone nonattain-
ment as described under section 110(a)(2)(D).5 In fashioning 
the SIP call, EPA focused on OTAG's determination that 
"[r]egional NOx emissions reductions are effective in produc-
ing ozone benefits." Proposed Rule, 62 Fed. Reg. 60,318, at 
60,320. EPA also took into consideration OTAG's conclusion 
that while NOx controls are effective in addressing regional 
ozone problems, VOC controls are most effective locally and 
are most advantageous to urban nonattainment areas. See 
id. Because OTAG concluded that NOx reductions provide the 
key to addressing regional ozone problems, EPA's SIP call 
addresses regional ozone nonattainment through NOx emis-
sions "budgets" established by the agency for each covered 
state. The budgets represent the amount of allowable NOx 
emissions remaining after a covered state prohibits the NOx 
amount contributing significantly to downwind nonattainment. 
See Final Rule, 63 Fed. Reg. 57,356, at 57,368. While EPA 
calculated the budgets using highly cost-effective emission 
controls, the agency allows the states to choose the control 
measures necessary to bring their emissions within the bud-
get requirements. See id. at 57,377; id. at 57,400. Under 
EPA's budget plan, a state "may choose from a broader menu 
of cost-effective, reasonable alternatives" including alterna-
tives that "may even be more advantageous in light of local 
concerns." Id. at 57,369-370. In fact, EPA has stated that 
the states have "full discretion in selecting the controls, so 
that [the states] may choose any set of controls that would 
assure achievement of the budget." Id. at 57,378. In addi-
tion, each state has the option of adopting an interstate 
trading program that allows it to purchase NOx "allowances" 
from sources that have elected to over-control. Id. at 57,430. 
The SIP call also gives the states the option in some circum-
stances to use "banked" allowances (i.e. allowances from prior 
years) to comply with emissions limits. See id.

 Petitioners assert that EPA's NOx budget program imper-
missibly intrudes on the statutory right of the states to 

__________
 5 As noted above, we will not address the 8-hour portion of the 
SIP call.

fashion their SIP submissions in the first instance. In sup-
port of this position, the petitioners primarily rely on our 
decision in Virginia v. EPA, 108 F.3d 1397 (D.C. Cir.), 
modified on other grounds, 116 F.3d 499 (D.C. Cir. 1997), 
where we held that EPA may not use a section 110(k)(5) SIP 
call to order states to adopt a particular approach to achiev-
ing the SIP requirements listed in section 110. Under the 
rule at issue in Virginia, EPA required states to adopt 
California's vehicle emission program and in effect set the 
numerical emissions limitations and mandated the means for 
the states to achieve the necessary emissions reductions. 
That case involved an EPA rule that required several states 
to reduce ozone precursors by a particular program and only 
allowed states to implement a more stringent program as an 
alternative or substitute. We held that EPA's approach 
exceeded its authority under section 110 because each state 
retains the authority to determine in the first instance the 
necessary and appropriate control measures needed to satisfy 
section 110's standards. See id. at 1407-09 (citing Train v. 
NRDC, 421 U.S. 60, 78-79 (1975)).

 Our holding in Virginia was mandated by the Supreme 
Court's decision in Train v. NRDC, 421 U.S. 60 (1975). 
Train involved a challenge to Georgia's procedures for revis-
ing source-specific emission limits adopted in a SIP. See id. 
at 68-71. The Train Court held that states have the au-
thority under the CAA to initially propose specific emission 
limitations. See id. at 79. The Court defined "emission lim-
itations" as "regulations of the composition of substances 
emitted into the ambient air from such sources as power 
plants, service stations, and the like. They are the specific 
rules to which operators of pollution sources are subject, 
and which if enforced should result in ambient air which 
meets the national standards." Id. at 78 (emphasis added). 
The Court further held that EPA has only "a secondary role 
in the process of determining and enforcing the specific, 
source-by-source emission limitations." Id. at 79 (emphasis 
added). The Train decision and subsequent precedent make 
clear that section 110 left to the states "the power to [initial-
ly] determine which sources would be burdened by regula-

tion and to what extent." Union Elec. Co. v. EPA, 427 U.S. 
246, 269 (1976) (emphasis added); cf. Virginia, 108 F.3d at 
1399, 1401, 1408 (involving a source-specific program); Riv-
erside Cement Co. v. Thomas, 843 F.2d 1246, 1247-48 (9th 
Cir. 1988) (citing Train and noting EPA's secondary role in 
enforcing source-by-source emissions limitations). As we 
elaborated in Virginia, "the Supreme Court decided ... that 
[section 110] did not confer upon EPA the authority to 
condition approval of [a state's] implementation plan ... on 
the state's adoption of a specific control measure." Virgi-
nia, 108 F.3d at 1408. For the reasons set forth below, we 
conclude that the NOx budgets do not fall within the realm 
of impermissible SIP call regulation as defined in Virginia 
and Train.

 Given the Train and Virginia precedent, the validity of the 
NOx budget program underlying the SIP call depends in part 
on whether the program in effect constitutes an EPA-imposed 
control measure or emission limitation triggering the Train-
Virginia federalism bar: in other words, on whether the 
program constitutes an impermissible source-specific means 
rather than a permissible end goal. However, the program's 
validity also depends on whether EPA's budgets allow the 
covered states real choice with regard to the control measure 
options available to them to meet the budget requirements.

 Section 110(a)(2)(D) requires SIPs to contain adequate 
provisions prohibiting emissions from "any source or other 
type of emissions activity within the State" that "contribute 
significantly" to NAAQS nonattainment in another state. 
Here, EPA mandates that 22 states and the District of 
Columbia implement section 110(a)(2)(D) using its NOx bud-
get system. In essence, the NOx budget in question is an 
EPA mandate prohibiting NOx emissions in the 23 jurisdic-
tions from exceeding a tonnage specific to that jurisdiction. 
See 63 Fed. Reg. 57,356 at 57,491-493 (1998). Of concern to 
petitioners, the budget rule prohibits states from seeking 
compliance, in whole or part, by controlling VOC emissions 
even though VOCs as well as NOx emissions contribute to 
ozone problems. See, e.g., id. at 57,359; see also 40 C.F.R. 
s 52.31(b)(7) (1998) (defining ozone precursors).

 Yet, the budget plan's defining aspects do not necessarily 
cause the program to conflict with the limiting principles 
contained in Train and Virginia. Analyzing the budget rule 
together with the relevant precedent, we hold that based on 
section 110's silence, EPA reasonably interpreted section 110 
as providing it with the authority to determine a state's NOx 
significant contribution level and agree with EPA that the 
NOx budget plan does no more than project whether states 
have reduced emissions sufficiently to mitigate interstate 
transport. See 63 Fed. Reg. at 57,368.

 Under section 110, EPA must "approve a [SIP] submittal 
as a whole if it meets all of the applicable requirements of 
[the Act]." 42 U.S.C. s 7410(k)(3). While the states have 
considerable latitude in fashioning SIPs, the CAA "nonethe-
less subject[s] the States to strict minimum compliance re-
quirements" and gives EPA the authority to determine a 
state's compliance with the requirements. Union Elec. Co., 
427 U.S. at 256-57 (referring to the requirements contained 
in the statute). Given EPA's authority to ensure that submit-
ted SIPs adequately prohibit significantly contributing emis-
sions, EPA permissibly relied on its general rulemaking 
authority to prospectively inform the states of EPA's signifi-
cance determinations.

 Moreover, EPA does not tell the states how to achieve SIP 
compliance. Rather, EPA looks to section 110(a)(2)(D) and 
merely provides the levels to be achieved by state-determined 
compliance mechanisms. Specifically, EPA set NOx reduction 
levels based, in part, on assumptions about reductions obtain-
able through highly cost-effective controls. See Final Rule, 
63 Fed. Reg. at 57,426. However, EPA made clear that 
states do not have to adopt the control scheme that EPA 
assumed for budget-setting purposes. See id. at 57,369-370. 
States can choose from a myriad of reasonably cost-effective 
options to achieve the assigned reduction levels. See, e.g., id. 
at 57,438 (noting possibilities with regard to mobile sources); 
id. at 57, 378 (noting possibilities with regard to stationary 
sources); id. at 57,416. While EPA bases the budgets here 
on "highly cost-effective" control measures, the states remain 
free to implement other "cost-effective" or "reasonably cost-

effective" measures in place of the ones identified by EPA. 
See id. at 57,378; 63 Fed. Reg. 60,318 at 60,328 (1997) (noting 
that "one State may choose to primarily achieve emissions 
reductions from stationary sources while another State may 
focus on emissions reductions from the mobile source sec-
tor"). More importantly, EPA went so far as to give the 
states "full discretion in selecting ... controls," 63 Fed. Reg. 
at 57,378, thereby allowing states to attain their budgets by 
imposing even quite unreasonable, very cost-ineffective con-
trols. In Virginia, we did not bar EPA from permitting 
more costly alternatives but rather alternatives states would 
consider "unreasonable or impracticable." Here, EPA ac-
commodates Virginia's mandate by allowing reasonable con-
trol alternatives and allowing states to focus reduction efforts 
based on local needs or preferences. See 63 Fed. Reg. at 
57,369; id. at 57,399-405; 62 Fed. Reg. at 60,328. Thus, real 
choice exists for the covered states.

 Regarding EPA's decision not to rely on VOC reductions, 
EPA reasonably concluded that long-range ozone transport 
can only be addressed adequately through NOx reductions. 
Petitioners' reliance and emphasis on VOC reductions in lieu 
of NOx reductions ignores the scientific basis for EPA's rule. 
OTAG and EPA concluded that VOC controls would not 
effectively address interstate ozone transport. Furthermore, 
states can cure any NOx reduction "disbenefits" with corre-
sponding optional VOC controls. See 62 Fed Reg. at 60,344-
345; 63 Fed. Reg. at 57,425. Thus, the SIP call cannot be 
invalidated merely because EPA reasonably chose not to 
regulate VOCs.

 In sum, we conclude that EPA's NOx budget program 
reasonably establishes reduction levels and leaves the control 
measure selection decision to the states. In addition, unlike 
the rule invalidated in Virginia, states implementing alterna-
tive control measures will not be penalized with more strin-
gent emissions targets. Since the challenged budget pro-
gram does not mandate a "specific, source-by-source emission 
limitation[ ]," the NOx budget plan does not run afoul of 
Train or Virginia.

B. Regulatory Flexibility Act

 The Regulatory Flexibility Act ("RFA"), 5 U.S.C. ss 601-
612, as amended in 1996 by the Small Business Regulatory 
Enforcement Fairness Act ("SBREFA"), Pub. L. No. 
114-121, Title II, 110 Stat. 847, 857-74, ss 201-253 (codified 
at 5 U.S.C. ss 601-612 (1994 & Supp. II 1996)), requires an 
agency, when proposing a rule for notice and comment, to 
"prepare and make available for public comment an initial 
regulatory flexibility analysis.... [that] describe[s] the im-
pact of the proposed rule on small entities," 5 U.S.C. s 603(a), 
including small businesses, small organizations, and small 
governmental jurisdictions. See id. s 601(6). In addition, 
when promulgating a final rule, an agency must "prepare a 
final regulatory flexibility analysis" that describes, among 
other things, "a summary of the significant issues raised by 
the public comments in response to the initial regulatory 
flexibility analysis, a summary of the assessment of the 
agency of such issues," and "the steps the agency has taken 
to minimize the significant economic impact on small entities." 
Id. s 604(a).

 However, these analyses are not required if the agency 
"certifies that the rule will not, if promulgated, have a signifi-
cant economic impact on a substantial number of small enti-
ties." Id. s 605(b). In the instant case, EPA certified that 
the proposed and final rule will not have a significant econom-
ic impact on a substantial number of small entities and, 
accordingly, did not perform any regulatory flexibility analy-
sis. See Final Rule, 63 Fed. Reg. at 57,478; Proposed Rule, 
62 Fed. Reg. at 60,375. RFA petitioners contend that EPA's 
certification was improper and in violation of the RFA. We 
disagree.

 The court has consistently held that the RFA imposes "no 
obligation to conduct a small entity impact analysis of effects 
on entities which it does not regulate." Motor & Equip. 
Mfrs. Ass'n. v. Nichols, 142 F.3d 449, 467 (D.C. Cir. 1998) 
(quoting United Distribution Cos. v. FERC, 88 F.3d 1105, 
1170 (D.C. Cir. 1996)); see also American Trucking, 175 F.3d 
at 1044. Therefore, the key issue in evaluating EPA's 

s 605(b) certification is whether the NOx SIP call "regulates" 
small entities.

 EPA based its certification on its view that the NOx SIP 
call "would not establish requirements applicable to small 
entities" because "it would require States to develop, adopt, 
and submit SIP revisions that would achieve the necessary 
NOx reductions and would leave to the States the task of 
determining how to obtain those reductions, including which 
entities to regulate." Final Rule, 63 Fed. Reg. at 57,478. We 
agree with EPA's statement that the SIP call does not 
directly regulate individual sources of emissions. The instant 
case is thus analogous to American Trucking, which upheld 
EPA's certification under s 605(b) because the revised 
NAAQS at issue "regulate small entities only indirectly--that 
is, insofar as they affect the planning decision of the States." 
American Trucking, 175 F.3d at 1044. Therefore, we con-
clude that EPA's certification under s 605(b) is justified.

 IV. Remaining Claims

A. Definition of "NOx Budget Unit"

 RFA petitioners also contend that EPA arbitrarily revised 
the definition of a "NOx budget unit" to bring certain small 
sources within the scope of the core group of emission-
producing sources to which the NOx Budget Trading Rule 
("model trading rule") applies.6 This contention is meritless.

__________
 6 To assist states in meeting their budgets and to facilitate the 
most cost-effective reductions, the SIP call established a model rule 
for interstate trading of NOx "allowances." Each state can choose 
whether to adopt the model rule, which will be administered by 
EPA, to adopt its own trading program, or to have no trading 
program at all. See Final Rule, 63 Fed. Reg. at 57,456-58.

 The core group definition is used to set the minimum require-
ments that a State would have to include in its trading rule in order 
to participate in the EPA-managed multi-state trading program. 
See id. at 57,461. EPA viewed that setting such requirements was 
necessary for controlling the administrative costs of managing the 
trading program. See id.

 In the proposed rule, a "NOx budget unit" was defined as a 
boiler that either serves electricity generators with a capacity 
greater than 25 megawatts ("MW") or does not serve genera-
tors but has a design heat capacity of greater than 250 million 
Btu/hr ("mmBTu/hr"). See Supplemental Notice for the 
Finding of Significant Contribution and Rulemaking for Cer-
tain States in the Ozone Transport Assessment Group Region 
for Purposes of Reducing Regional Transport of Ozone ("Sup-
plemental Notice of Proposed Rule"), 63 Fed. Reg. 25,902, 
25,978 (1998). EPA sought comment on "the appropriateness 
of including [such] categories ..., whether the size cut-offs 
should be higher or lower for these source categories, and the 
appropriateness of including other source categories in the 
core group." Id. at 25,923. In the final rule, EPA discussed 
and revised the definition to expand the core group by 
including large boilers--those with design heat capacity of 
greater than 250 mmBtu/hr--even if they served generators 
with a capacity less than 25 MW. See Final Rule, 63 Fed. 
Reg. at 57,518. EPA explained that it was making this 
change in order to address the concern raised in the com-
ments about excluding large boilers with high levels of emis-
sion just because they happen to serve small generators. See 
id. at 57,461.

 EPA's revision is reasonable. The only argument that 
RFA petitioners seem to have against the change is that it 
contradicts EPA's statement elsewhere that "small electrical 
generators less than 25 MW ... will be exempt under the 
final model rule." Id. at 57,463. It is unclear why this 
statement renders EPA's final action arbitrary. EPA's defi-
nition of a NOx budget unit and the reasons for its change are 
set forth in the preamble to the final rule, and the most that 
the RFA petitioners have demonstrated is that EPA made at 
least one statement that was, as EPA concedes in its brief, 
"incomplete in that it did not address the case of large boilers 
with small generators." Such a minor oversight in the draft-
ing of the preamble to the final rule does not render the 
substantive decision by EPA arbitrary.

B. Council of Industrial Boiler Owners

 1. Introduction
 
 In the rulemaking, EPA distinguished between electricity 
generating units ("EGUs") and non-electricity generating 
units ("non-EGUs"). Council of Industrial Boiler Owners 
("CIBO"), a trade association whose membership consists of 
companies and universities operating industrial boilers and 
turbines ("industrial boilers"), which constitute one category 
of non-EGUs, challenges the NOx SIP call for being based on 
the following arbitrary and capricious actions by EPA: EPA's 
failure to determine whether non-EGUs are significant con-
tributors, EPA's flawed cost assumptions in its determination 
of cost-effective control measures for non-EGUs, EPA's erro-
neous calculation of non-EGU budgets, and EPA's arbitrary 
redefinition of the term "EGU." We agree only that EPA's 
redefinition of EGUs was arbitrary and capricious.

 2. Significant Contribution of Industrial Boilers
 
 CIBO challenges EPA's decision to include non-EGU boil-
ers in the rule without having isolated non-EGU emissions to 
determine whether they "significantly contribute" to the in-
terstate ozone transport problem and whether implementing 
highly cost-effective emissions reduction measures on indus-
trial boilers would ameliorate nonattainment in downwind 
states. CIBO maintains that non-EGU boilers typically have 
significantly shorter stacks than EGUs and that their emis-
sions, as a result, fall below the "mixing layer" that promotes 
long-range NOx transport. Therefore, CIBO contends, indus-
trial boilers as a group can have no impact on long-range 
ozone transport. However, this factual claim fails in view of 
contrary evidence in the record. OTAG's Executive Report 
states as one of its major conclusions that "[b]oth elevated 
(from tall stacks) and low-level NOx reductions are effective." 
Executive Report at 4. EPA reiterated this finding by OTAG 
in the NPRM, see Proposed Rule, 62 Fed. Reg. at 60,332, it 
relied on the finding, and it appears that members of CIBO 
never challenged it during the comment period. Therefore, 
we cannot say EPA's inclusion of non-EGUs in the group of 
significantly contributing sources was arbitrary.

 3. Cost-Effectiveness Calculation for Industrial Boilers' 
 Control Measures
 
 CIBO also challenges EPA's conclusion that industrial boil-
ers could achieve a 60% emissions reduction using highly 
cost-effective control measures, see Final Rule, 63 Fed. Reg. 
at 57,418, as based on flawed cost calculations. More specifi-
cally, CIBO lists the following alleged problems in EPA's cost 
assumptions:

 - EPA's assumption of 10 years as the lifetime of all 
control measures for industrial boilers, except for selective 
catalytic reduction and selective non-catalytic reduction con-
trols, for which 20 years was assumed.

 - EPA's use of a 10% discount rate, not 7%, in its cost-
effectiveness analysis.

 - EPA's failure to take into account the fact that control 
effectiveness can vary by as much as 10% to 20%.

 - EPA's failure to take into account cost and feasibility 
implications of load variability and firing of multiple fuels.

 - EPA's assumption of NOx emission allowance costs of 
$2,000 per ton, when emission allowances trade for $5,500 to 
$6,300 per ton.

 The general problem of these criticisms is that CIBO 
merely lists several items as problems and labels all of them 
"irrational" without explaining why its claims should concern 
the court. Given that almost all of CIBO's challenges involve 
technical details on which the court generally defers to the 
agency's expertise, CIBO's failure to explain why the so-
called problems it identifies amount to an arbitrary and 
capricious decisionmaking is fatal to its claims.7 Therefore, 

__________
 7 For instance, the last item on the list, that it is arbitrary and 
capricious for EPA to assume NOx emission allowance costs of 
$2,000 per ton when emission allowances now trade for $5,500 to 
$6,300 per ton, is insufficiently explained. Of course, if the firms in 
the market generating entitlement prices of $5,500 to $6,300 per ton 
were regulated at the same degree of stringency as EPA contem-
plates for firms expected to be burdened under the present rule, the 

we reject CIBO's claims regarding EPA's underlying cost 
assumptions about industrial boilers.

 4. Determination of Non-EGU Component of State NOx 
 Budgets
 CIBO contends that EPA's calculation of the non-EGU 
component for the State NOx budget lacks adequate support 
in the record and lists the following as problems:

 - Non-EGU inventories had errors.

 - EPA's use of Bureau of Economic Analysis growth factor 
to project 2007 emission levels have "inherent error."

 - EPA employed "crude extrapolations" to identify large 
non-EGU boilers.

 - The "default boiler capacity file" is not in the record and 
the record does not reveal how EPA manipulated the data.

 - The source of Bureau of Economic Analysis growth 
factors is not identified in the record, and the record does not 
show how EPA manipulated the data.

 - It is unknown whether EPA credited NOx reductions 
from fluidized-bed combustion technology.

 Again, CIBO merely presents a list of problems without 
explaining why these alleged errors render EPA's rulemaking 
arbitrary or capricious. In addition, CIBO members had 
repeated opportunities to provide correct information for 
some of these items during the rulemaking process. CIBO's 
poorly articulated, blanket accusations at this late stage con-
tribute little to improve the quality of agency rulemaking; 
therefore, we reject CIBO's challenges regarding EPA's cal-
culation of NOx budgets for non-EGUs.
__________
market price would be strong evidence that compliance would cost 
far more than the $2,000 per ton figure that EPA has used. No one 
would pay $6,000 for an entitlement to emit a ton that he could 
remove at a cost of $2,000; the price of an entitlement could not 
exceed the marginal removal cost. But if the prices to which CIBO 
points arose among firms more stringently regulated, there would 
be no such contradiction. CIBO has not even endeavored to show 
equivalent stringency.

 5. Definition of EGU
 
 More persuasively, CIBO contends that EPA revised the 
definition of "EGU" without adequate notice. Throughout 
the rulemaking, EPA defined an EGU as it did under the acid 
rain program, which excludes from the category of "utility 
units" those cogeneration units that sell less than one-third of 
their potential electrical output capacity or less than 25 MW 
per year. See 42 U.S.C. s 7651a(17)(C). However, two 
months after the promulgation of the rule, EPA redefined an 
EGU as a unit that serves a "large" generator (greater than 
25MW) that sells electricity. CIBO contends that EPA did 
not provide sufficient notice and opportunity to comment on 
this revision, especially considering that the industrial boilers 
have relied on the previous definition for a number of years. 
We agree.

 EPA maintains that it provided adequate notice in the May 
1998 supplemental notice, stating that "deregulation of elec-
tric utilities" means that "it is not clear how ownership of the 
electricity generating facilities will evolve." Supplemental 
Notice of Proposed Rule, 63 Fed. Reg. at 25,923. Given that 
"there is no relevant physical or technological difference 
between utilities and other power generators," EPA pro-
posed, "all large electricity generating sources, regardless of 
ownership," should be treated the same. Id. There are 
several problems with EPA's response. First, it is undisput-
ed that EPA was departing from the definition of EGUs as 
used in prior regulatory contexts, and EPA was not explicit 
about the departure from the prior practice until two months 
after the rule was promulgated. Neither the proposed rule-
making in November 1997 nor the final rule in October 1998 
introduced the new definition. EPA waited until the Decem-
ber 1998 correction notice to announce that it will "classify as 
an EGU any boiler ... that is connected to a generator 
greater than 25 MWe from which any electricity is sold." 
Correction and Clarification to the Finding of Significant 
Contribution and Rulemaking for Purposes of Reducing Re-
gional Transport of Ozone ("Correction Notice to Final 
Rule"), 63 Fed. Reg. 71,220, 71,223 (1998). After the Decem-
ber correction notice, EPA reopened the comment period for 

sixty days for comments on this and other issues. In EPA's 
May 1999 response to the comments, EPA, for the first time, 
discussed why the change was necessary and offered a justifi-
cation largely based on recent changes in the electric power 
industry. See Responses to the 2007 Baseline Sub-Inventory 
Information and Significant Comments for the Final NOx SIP 
Call 10-12 (May 1999) ("Responses to Final Comments").

 As to the statement in the May 1998 supplemental notice 
that EPA claims constitutes notice, this statement was given 
in EPA's discussion of how the core group of sources for the 
model trading rule should be defined, and not in the context 
of a discussion about the general distinction between EGUs 
and non-EGUs for the purposes of calculating state budgets. 
Cf. Small Refiner Lead Phase-Down Task Force v. EPA, 705 
F.2d 506, 550 (D.C. Cir. 1983). Moreover, EPA also explicitly 
observed in the same May notice discussion about the model 
trading rule that "[m]any of the definitions ... are the same 
as those used in ... the Acid Rain Program regulations, in 
order to maintain consistency among programs." Supple-
mental Notice of Proposed Rule, 63 Fed. Reg. at 25,923. 
Given the vague and conflicting signals that EPA was send-
ing, it is an exaggeration to state that some general "theme" 
of the regulatory consequences of deregulation of the utility 
industry throughout rulemaking meant that EPA's last-
minute revision of the definition of EGU should have been 
anticipated by industrial boilers as a "logical outgrowth" of 
EPA's earlier statements. See American Water Works 
Ass'n. v. EPA, 40 F.3d 1266, 1274-75 (D.C. Cir. 1994).

 EPA contends that even assuming that CIBO did not have 
adequate notice and opportunity to comment on the EGU 
definition, the error has been cured because it reopened the 
comment period on this issue after its announcement of the 
revision. See Correction Notice to Final Rule, 63 Fed. Reg. 
at 71,221-23. This response is to no avail. During the new 
comment period, some commenters complained that there had 
not been sufficient notice and opportunity to comment on the 
EGU redefinition. See Responses to Final Comment, at 12. 
EPA's response to this charge primarily relied on the claim 

that there had been adequate notice prior to the redefinition, 
see id., and we have already rejected that argument.

 Therefore, we conclude EPA did not provide sufficient 
notice and opportunity to comment for its redefinition of 
EGUs and remand the rulemaking to EPA for further consid-
eration in light of this opinion.

C. INGAA

 Interstate Natural Gas Association of America ("INGAA"), 
a trade association that represents major interstate natural 
gas transmission companies in the United States, contends 
that EPA did not provide adequate notice and opportunity to 
comment on the control level assumed for "large" stationary 
internal combustion ("IC") engines in its determination of 
state NOx budgets. We agree.

 EPA's NPRM in November 1997 assumed a 70% control 
level for large IC engines, see Proposed Rule, 62 Fed. Reg. at 
60,354, after considering and rejecting an 80% control level. 
See id. at 60,348. Then, in the supplemental notice in May 
1998, EPA continued to assume the 70% control level. See 
Supplemental Notice of Proposed Rule, 63 Fed. Reg. at 
25,908. EPA stated in the same notice that it "intends to 
further analyze" control approaches for IC engines and said 
that "[a]s the above analyses are completed, EPA intends to 
place them in the docket." Id. at 25,909. EPA did not 
present a new analysis until September 4, 1998, when it 
concluded that a 90% control level was more appropriate for 
large IC engines. See Technical Support Document for Sta-
tionary International Combustion Engines 2 (September 4, 
1998). When the rule was finally promulgated in October 
1998, EPA stated that it was assuming a 90% control level. 
See Final Rule, 63 Fed. Reg. at 57,418.

 INGAA contends that EPA's switch from 70% to 90% for 
large IC engines was unanticipated and that EPA should 
have allowed comments on the issue. Considering EPA's 
repeated affirmation of the 70% assumption throughout rule-
making and rejection of a higher, 80% assumption earlier, a 

revision in its assumption less than one month before the final 
rule was promulgated hardly provided adequate notice, espe-
cially given the magnitude of the consequences of the pro-
posed change on the regulated bodies. Therefore, we remand 
for further consideration on this issue.8

 In addition, INGAA challenges EPA's definition of large IC 
engines. EPA, in the final rule, distinguished between large 
and small sources by defining a "cutoff level." 63 Fed. Reg. 
at 57,414. EPA assumed no control for sources below the 
cutoff level and defined small sources as units with a capacity 
less than or equal to 250 mmBtu/hr and with emissions less 
than or equal to one ton per day. See id. at 57,415. EPA 
added that "EPA is relying on a capacity approach first and a 
tons per day approach second (where a capacity data is not 
available or appropriate)" to define small sources. Id. at 
57,416. Then, in the December correction notice, EPA large-
ly repeated the same methodology for determining the cutoff 
level, but added that "[a] stationary internal combustion 
engine and a cement plant were determined to be 'large' if its 
1995 average daily ozone season emissions were greater than 
one ton." Correction Notice to Final Rule, 63 Fed. Reg. at 
71,224.

 INGAA contends that EPA did not follow its own standard 
in the correction notice and singled out IC engines and 
cement plants without explanation. Although EPA's various 
statements on this issue throughout rulemaking have not 
always been very clear or entirely consistent, EPA went 
through an extensive comment period on this issue, see Final 
Rule, 63 Fed. Reg. at 57,415-17, and we agree with EPA that 
the change that INGAA criticizes for being arbitrary is 
merely a minor clarification that satisfies the reasonableness 
standard.

__________
 8 INGAA further contends that, even putting aside the notice 
issue, the documents that EPA relies on do not support EPA's 
assumption of 90% control level. Because we are remanding on the 
basis of the conclusion that there was inadequate notice, we do not 
reach the merits of the issue.

D. PP&L

 1. EPA's Restrictions on Early Reduction Credits
 
 PP&L, an electric utility that owns several generating 
stations in Pennsylvania, contends that EPA arbitrarily limit-
ed the number of "early reduction credits" ("ERCs"). We 
disagree.

 Under the SIP call, a source can generate ERCs if it 
reduces its NOx emissions before May 2003 to a level below 
that is required by any regulatory scheme. ERCs can then 
be used to compensate for emitting emissions above required 
levels in a later time period. See Final Rule, 63 Fed. Reg. at 
57,430. EPA limited the amount of available ERCs for each 
state to the size of each state's compliance supplement pool 
("CSP"). See id. at 57,474. The CSP is an additional allow-
ance of emissions that allows states to emit 200,000 tons of 
NOx in the 2003-2004 ozone seasons over the state emissions 
budgets. Id. at 57,428. EPA created the CSP in response to 
the comments that if all utilities had to install pollution 
control equipment by May 1, 2003, there might be disruptions 
in electricity supply. See id. If a state chooses to use the 
CSP, it can either provide ERCs or distribute the allowances 
to sources that demonstrate a need for the compliance supple-
ment. See id. at 57,429-30.

 PP&L contends that imposing this limit on the number of 
ERCs is arbitrary and capricious because placing any limit on 
ERCs is environmentally counterproductive. We do not find 
this contention persuasive. EPA noted during the comment 
period that ERCs, although generally beneficial, can be costly 
in that they allow states to exceed their budgets. See Re-
sponses to Significant Comments on the Proposed Finding of 
Significant Contribution and Rulemaking for Certain States 
in the Ozone Transport Assessment Group (OTAG) Region 
for Purposes of Reducing Regional Transport of Ozone 346 
(September 1998) ("Responses to Comments"). EPA noted 
further that the CSP, by establishing a cap on the number of 
allowances to be distributed, limited such potential costs. Id. 
EPA's decision is thus reasonable.

 PP&L also contends that EPA has not demonstrated why 
the "flow control mechanism" is not sufficient to address its 
concern. Under the flow control mechanism, the use of 
banked allowances exceeding 10% of the emissions budget for 
sources in the trading program is either flatly prohibited or 
discouraged by discounting the value of ERCs used as such, 
and states can choose between either method. See Final 
Rule, 63 Fed. Reg. at 57,431-32. This complaint by PP&L 
overlooks the fact that EPA included the flow control mecha-
nism in the regulatory scheme "[a]s a final safeguard limiting 
the impact of additional allowances eligible for banking in the 
system." Responses to Comments, at 346. Therefore, it was 
a safeguard created in addition to the CSP limitation. It was 
within EPA's discretion to devise multiple limitations to con-
tain the environmental cost of ERCs.

 PP&L further contends that, even if it is rational for EPA 
to place a limit on the amount of ERCs, EPA's choice of 
setting the limit at the same amount as the CSP is arbitrary 
and capricious. This contention fails as well. The record 
shows that EPA allowed ERCs merely as a mechanism for 
managing the CSP, not as an independent program with a 
purpose separate from that of the CSP. See Final Rule, 63 
Fed. Reg. at 57,428-33. Therefore, EPA's decision to limit 
the amount of ERCs to the size of the CSP was reasonable.

 2. Emissions Multiplier for Low Mass Emission Units
 
 PP&L also contends that EPA arbitrarily required "low 
mass emission units" ("LMEUs") to use a 15% multiplier to 
calculate their emissions. We disagree.

 EPA allows LMEUs either to use a generic default NOx or 
to determine a unit-specific NOx emission rate by conducting 
a stack test once every five years. Because EPA found that 
the stack test results can vary by 15% or more depending on 
atmospheric conditions, EPA requires an LMEU to calculate 
its emissions rate by adding 15% to the stack test result. See 
Final Rule, 63 Fed. Reg. at 57,490.

 PP&L contends that this is unreasonable because EPA has 
stated that the testing would likely underestimate emissions 

during cooler less humid conditions. See id. PP&L reasons 
that because the SIP call applies only during summer seasons 
(when ozone forms), that the stack test underestimates emis-
sions during the winter cannot justify the 15% multiplier. 
This contention is to no avail. Because the record contains 
evidence that NOx rates determined by the stack test can 
vary widely even during the ozone season, EPA's decision was 
reasonable. See Docket A-97-35, Item IV-A-1 at 43-54 
(August 26, 1998).

 Conclusion

 We vacate EPA's final rule with respect to Wisconsin, 
Missouri, and Georgia (see Part II.A-B). These cases are 
remanded for further consideration in light of this opinion. 
We hold that EPA failed to provide adequate notice of a 
change in the definition of an electric generating unit (see 
Part IV.B.5), and that EPA did not provide adequate notice of 
a change in the control level assumed for large stationary 
internal combustion engines (see Part IV.C). These cases are 
also remanded.

 In all other respects, the petitions for review are denied.

 So ordered.

 Sentelle, Circuit Judge, dissenting: Unlike the majority's 
journey through this regulatory scheme, mine is neither 
lengthy nor complex, because I get off at the first stop. In 
promulgating the regulations at issue, EPA purported to 
exercise the authority Congress conferred upon it to enforce 
the requirements of 42 U.S.C. s 7410(a)(2)(D)(i)(I) which 
empowers the Administrator to police the contents of State 
Implementation Plans ("SIPs"), specifically to ensure that 
such plans contain

 adequate provisions ... prohibiting ... any source or 
 other type of emissions activity within the State from 
 emitting any air pollutant in amounts which will ... 
 contribute significantly to nonattainment in, or interfere 
 with maintenance by, any other State with respect to any 
 such national primary or secondary ambient air quality 
 standard.... 
 
42 U.S.C. s 7410(a)(2)(D)(i)(I) (1994) (emphasis added). EPA 
is a federal agency--a creature of statute. It has no constitu-
tional or common law existence or authority, but only those 
authorities conferred upon it by Congress. If there is no 
statute conferring authority, a federal agency has none. The 
only statute upon which EPA purports to rely in the current 
controversy is s 7410(a)(2)(D)(i)(I). That section provides 
authority for EPA to require States to act in a certain fashion 
based upon the presence of sources or activities which emit 
"pollutants in amounts which will ... contribute significantly 
to nonattainment." It would appear to me that Congress 
clearly empowered EPA to base its actions on amounts of 
pollutants, those amounts to be measured in terms of signifi-
cance of contribution to downwind nonattainment. Instead, 
EPA has chosen, doubtless in the pursuit of beneficent ends, 
to assert authority to require the SIPs to contain provisions 
based not on the amounts of pollutants, nor even on the 
relative significance of the contributions of such pollutants to 
downwind nonattainment, but on the relative cost effective-
ness of alleviation. I agree with the State petitioners that it 
is undeniable that EPA has exceeded its statutory authority.

 We have before had occasion to remind EPA that its 
mission is not a roving commission to achieve pure air or any 
other laudable goal. In American Petroleum Institute v. 
United States EPA, 52 F.3d 1113 (D.C. Cir. 1995), we re-
viewed an EPA rule requiring that thirty percent of the 
oxygen in reformulated gasoline be derived from renewable 
sources, such as ethanol. The statutory authority under 
which EPA operated, 42 U.S.C. s 7545(k)(1) empowered EPA 
to promulgate regulations achieving "the greatest reduction 
in emissions of ozone forming volatile organic com-
pounds...." 42 U.S.C. s 7545(k)(1). Although EPA ad-
vanced commendable goals of economic benefit for its inclu-
sion of the additional goal of ethanol market protection, we 
struck down the overreaching and reminded EPA that "it is 
axiomatic that an administrative agency's power to promul-
gate legislative regulations is limited to the authority delegat-
ed by Congress." API, 52 F.3d at 1119 (quoting Bowen v. 
Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988)).

 Similarly, in Ethyl Corp. v. EPA, 51 F.3d 1053 (D.C. Cir. 
1995), we considered EPA's denial of a Clean Air Act waiver 
application based on health considerations. We did not sug-
gest that EPA acted in bad faith or that health considerations 
were not important, but we repaired to the statutory grant of 
authority in 42 U.S.C. s 7545(f)(4), which based the Adminis-
trator's authority to deny waiver solely on the property of an 
additive to "cause or contribute to a failure of any emission 
control device or system...." 42 U.S.C. s 7545(f)(4). We 
again granted the petition for review of the Administration's 
action, reminding EPA that where "the plain language of a 
provision makes it clear that ... decisions are to be based on 
one criterion, the EPA cannot base its decision on other 
criteria," even on a criterion as laudable as the health of the 
public. Ethyl Corp., 51 F.3d at 1058.

 For all the majority's discussion of inconsistent arguments 
by States and the possibility of taking costs into account 
elsewhere raised by the Administration and adopted by the 
majority, I do not see why the present controversy does not 
fall squarely within the four corners of API and Ethyl Corp. 

Congress set forth one criterion: the emission of an amount 
of pollutant sufficient to contribute significantly to downwind 
nonattainment. EPA adopted a different criterion: the cost 
effectiveness of alleviation. I would remind the agency once 
more of the lessons of API and Ethyl Corp., allow the 
petitions for review, and end the case.

 The majority makes a fundamental mistake by divorcing 
the adverb "significantly" from the verb it modifies, "contrib-
ute." The majority compounds its error by divorcing signifi-
cantly from the rest of the statutory provision in issue. Maj. 
Op. at 19-23. By focusing on "significance" or what it means 
to be "significant," the majority ignores the fact that the 
statute permits EPA to address that which is "contribut[ed] 
significantly." 42 U.S.C. s 7410(a)(2)(D)(i)(I) (emphasis add-
ed). And what should EPA look for as being contributed 
significantly? Congress clearly answered that question for 
the agency as being an "amount" of an "air pollutant." Id. 
Considering that Congress expressly gave EPA authority 
with regard to "any air pollutant in amounts which will ... 
contribute significantly to nonattainment ...," id. (emphasis 
added), I marvel at an interpretation that permits cost effec-
tiveness to find a place in a statutory provision addressing 
amounts of air pollutant contribution. While the contribution 
must affect nonattainment significantly, no reasonable read-
ing of the statutory provision in its entirety allows the term 
significantly to springboard costs of alleviation into EPA's 
statutorily-defined authority. Given s 7410(a)(2)(D)(i)(I)'s 
mandate as a whole, it becomes clear that EPA and the 
majority have to contort the statute's language by isolating 
the term significantly and ignoring the terms air pollutant, 
amounts, and contribute in order to work cost considerations 
into the statute. I just cannot agree with such an unusual 
exercise in statutory construction.

 I see nothing in Chevron U.S.A. Inc. v. NRDC, Inc., 467 
U.S. 837 (1984), that either compels or counsels the majority's 
result. EPA argues that Congress did not define significant 
contribution. True, it did not. Neither did it define amount. 
But neither EPA nor the majority have offered any reason-
able interpretation of those words which makes them depend 

upon or even relate to the cost effectiveness of alleviation.1 
EPA comes close to arguing: Congress has not expressly 
forbidden us to use this criterion, therefore we may use it. 
As we said in Ethyl Corp.:

 To suggest, as the [EPA] effectively does, that Chevron 
 step two is implicated any time a statute does not 
 expressly negate the existence of a claimed administra-
 tive power ..., is both flatly unfaithful to the principles 
 of administrative law ... and refuted by precedent.
 
51 F.3d at 1060. Because the majority's deference to EPA's 
unreasonable statutory interpretation as couched in the agen-
cy's scurrilous "second-step" cost effectiveness analysis ven-
tures off track, as I said, I am getting off at the first stop.

 Because I would invalidate the regulatory scheme before us 
at its inception, I will not address the subsidiary issues 
pursued by my colleagues.

__________
 1 Contrary to the suggestion of the majority, neither of the cases 
cited by the majority bear any implication that the cost of alleviat-
ing or otherwise dealing with risk expressed as a noun or a verb has 
any effect upon the definition of "significant" or "significantly" used 
as an adjective or adverb modifying that noun or verb. The portion 
of Industrial Union Department v. American Petroleum Institute, 
448 U.S. 607, 655 (1980) (plurality opinion) quoted by the majority 
to the effect "that a 'significant' risk ... is not a mathematical 
straitjacket," (Maj. Op. at 20) does not deal in any fashion with the 
cost of alleviation. Rather, Justice Stevens in that opinion was 
contrasting the significance of a one-in-a-billion chance of cancer 
from drinking chlorinated water against the one-in-a-thousand risk 
that regular inhalation of certain benzene-containing vapors would 
be fatal. Obviously, the "significance" of the risk deals with its 
importance, not the cost of its alleviation. Equally off point is 
International Union, United Auto Workers v. OSHA, 37 F.3d 665, 
668-69 (D.C. Cir. 1994), which concerned the cost-effectiveness of 
alleviating measures directed at risk theretofore determined to have 
been significant, not with the use of cost-effectiveness in determin-
ing the significance of the risk vel non.